KELLUM, Judge.
On November 18, 2002, Bobby O’Lee Phillips and his codefendant, Oscar Roy Doster, were arrested near Ozona, Texas, on outstanding Alabama fugitive arrest warrants, bringing an end to a crime spree that began when Phillips, Doster, and two other inmates escaped from the custody of the Covington County jail two weeks earlier on November 4, 2002. Over the two-week period that Phillips and Doster were at large, they murdered Paul LeMaster, as well as committed numerous property crimes at six locations in Covington County: (1) VFW Post 3454; (2) Jason Pettie’s mobile home; (3) the Florala City Yard; (4) Florala High School; (5) Conecuh Riv *978 er Baptist Church; and (6) Pleasant Home School.
In February 2003, a Covington County grand jury returned a 23-count indictment against Phillips, charging him with escape in the first degree, six counts of capital murder, and numerous property crimes.
Following a trial by jury, Phillips was convicted of three counts of capital murder in connection with the death of Paul Le-Master. The murder was made capital because: (1) the murder was committed during the course of a first-degree burglary, see § 13A-5-40(a)(4), Ala.Code 1975 (count VII of the indictment); (2) the murder was committed during the course of a first-degree robbery, see § 13A-5^10(a)(2), Ala.Code 1975 (count X of the indictment); and (3) the murder was committed by Phillips firing a deadly weapon from outside LeMaster’s residence while LeMaster was inside the residence, see § 13A-5-40(a)(16), Ala.Code 1975 (count XI of the indictment).[1]
The jury recommended, by a vote of 12-0, that Phillips be sentenced to death for the capital-murder convictions. The circuit court accepted the jury’s recommendation, and it sentenced Phillips to death on the three capital-murder convictions.[2]
The jury also convicted Phillips of the following 16 crimes:
1. Escape in the second degree, see § 13A-10-32, Ala.Code 1975 (count I of the indictment[3]). The circuit court sentenced Phillips as a habitual felony offender to life imprisonment.[4] The circuit court ordered this sentence to be served consecutively to the sentences imposed for the remaining convictions.
2. Burglary in the third degree, see § 13A-7-7, Ala.Code 1975, for the burglary of VFW Post 3454 (count II of the indictment). The circuit court sentenced Phillips as a habitual felony offender to life imprisonment.
3. Theft of property in the second degree, see § 13A-8-4, Code of Alabama, for the theft of various items from VFW Post 3454 (count III of the indictment). The circuit court sentenced Phillips as a habitual felony offender to life imprisonment.
The sentences imposed pursuant to counts II and III, the crimes committed at VFW Post 3454, were to be served concurrently to one another but consecutively to all the remaining sentences. See Ex parte McKelvey, 630 So.2d 56, 57-8 (Ala.1992) (defendant may be convicted of both burglary and theft arising out of same incident but may receive only a single sentence).
4. Burglary in the first degree, see § 13A-7-5, Ala.Code 1975, for the burglary of Jason Pettie’s mobile home (count IV *979 of the indictment). The circuit court sentenced Phillips as a habitual felony offender to life imprisonment without the possibility of parole.
5. Theft of property in the first degree, see § 13A-8-3, Ala.Code 1975, for the theft of various items from Jason Pettie’s mobile home (count V of the indictment). The circuit court sentenced Phillips as a habitual felony offender to life imprisonment.
The sentences imposed for convictions under counts IV and V, the crimes committed at Jason Pettie’s mobile home, were to be served concurrently to one another but consecutively to the remaining sentences. See Ex parte McKelvey, supra.
6. Burglary in the third degree, see § 13A-7-7, Ala.Code 1975, for the burglary of the Florala City Yard (count XIII of the indictment). The circuit court sentenced Phillips as a habitual felony offender to life imprisonment.
7. Theft of property in the second degree, see § 13A-8-4, Ala.Code 1975, for the theft of various items from the Florala City Yard (count XIV of the indictment). The circuit court sentenced Phillips as a habitual felony offender to life imprisonment.
The sentences imposed for convictions under counts XIII and XIV, the crimes committed at the Florala City Yard, were to be served concurrently to one another but consecutively to the remaining sentences. See Ex parte McKelvey, supra.
8. Burglary in the third degree, see § 13A-7-7, Ala.Code 1975, for the burglary of the Florala High School (count XV of the indictment). The circuit court sentenced Phillips as a habitual felony offender to life imprisonment.
9. Theft of property in the second degree, see § 13A-8-4, Ala.Code 1975, for the theft of various items from Florala High School (count XVI of the indictment). The circuit court sentenced Phillips as a habitual felony offender to life imprisonment.
10. Criminal mischief in the third degree, see § 13A-7-23, Ala.Code 1975, for damage done to vending machines inside Florala High School (count XVII of the indictment[5]). The circuit court sentenced Phillips to six months’ incarceration in the Covington County jail.
The sentences imposed for the convictions under counts XV, XVI, and XVII, the crimes committed at the Florala High School, were to be served concurrently to one another but consecutively to the remaining sentences. See Ex parte McKel-vey, supra; Rowell v. State, 447 So.2d 193, 196 (Ala.Crim.App.1983) (criminal mischief not a lesser-included offense of burglary as a matter of law).
11. Burglary in the third degree, see § 13A-7-7, Ala.Code 1975, for the burglary of Pleasant Home School (count XVIII of the indictment). The circuit court sentenced Phillips as a habitual felony offender to life imprisonment.
12. Theft of property in the third degree, a violation of § 13A-8-5, Ala.Code 1975, for various items stolen from Pleasant Home School (count XIX of the indictment). The circuit court sentenced Phillips to one year of incarceration in the Covington County jail.
13. Criminal mischief in the third degree, see § 13A-7-23, Ala.Code 1975, for damage to vending machines inside Pleasant Home School (count XX of the indictment [6]). The circuit court sentenced Phil *980 lips to six months’ incarceration in the Covington County jail.
The sentences imposed for convictions under counts XVIII, XIX, and XX, the crimes committed at the Pleasant Home School, were to be served concurrently to one another but consecutively to the remaining sentences. See Ex parte McKelvey, supra; Rowell v. State, supra.
14. Burglary in the third degree, see § 13A-7-7, Ala.Code 1975, for the burglary of the Conecuh River Baptist Church (count XXI of the indictment). The circuit court sentenced Phillips as a habitual felony offender to life imprisonment.
15. Burglary in the third degree, see § 13A-7-7, Ala.Code 1975, for the burglary of the fellowship hall of the Conecuh River Baptist Church (count XXII of the indictment). The circuit court sentenced Phillips as a habitual felony offender to life imprisonment.
16. Theft of Property in the third degree, a violation of § ISA-8-5, Ala.Code 1975, for the theft of various items in the Conecuh River Baptist Church (count XXIII of the indictment). The circuit court sentenced Phillips to one year of incarceration at the Covington County jail.
The sentences imposed for convictions under Count XXI, XXII, and XXIII, the crimes committed at the Conecuh River Baptist Church, were to be served concurrently to one another but consecutively to the remaining sentences. See Ex parte McKelvey, supra.
The circuit court ordered Phillips to pay a total amount of restitution of $14,473.54, to be allocated to the various victims of the crimes. The circuit court also ordered Phillips to pay court costs and attorney fees.
Phillips filed a motion for new trial, which the circuit court summarily denied. This appeal followed.

Facts of the Crimes

After Phillips was arrested, he gave a detailed statement to Covington County Sheriffs investigators, confessing his involvement in all the aforementioned crimes. This statement was admitted into evidence at trial. In addition to corroborating the details of the crimes and Phillips’s involvement in the crimes, Phillips’s statement helped paint a complete picture of the events that transpired while he and Doster were at large. The following facts were compiled from the State’s evidence presented at trial, including Phillips’s statement.
In the early morning hours of November 4, 2002,[7] inmates Bobby O’Lee Phillips, Oscar Roy Doster, Michael Barbaree, and Charles Meeks escaped from the Coving-ton County Jail. The four inmates pried the door off a ventilation area in the jail, kicked out the louvers connected to the outside wall of the jail, and then climbed down the louvers to the ground.
In order to get over the inside perimeter razor-wire fence, the men went to the back of the jail and climbed up another set of louvers. They used a mattress pad to cover the razor-wire fence, and then they went over the fence. Once outside the fence, Phillips removed his jail coveralls— he had on clothes underneath the coveralls. To get over the outside perimeter razor-wire fence, the group scaled the communications tower, and then climbed down a guy wire, over the fence, to the outside.
After the men escaped, Barbaree split off from the group. Phillips, Doster, and *981 Meeks traveled on foot through the woods, on back roads, and along a railroad track until they came to an abandoned shed. It was raining, so the three men stayed in the abandoned shed until the morning of November 4.
After leaving the shed around 9:00 a.m. that morning, the group continued to travel on foot along the railroad tracks. Although not clear from the record, eventually Doster and Phillips became separated from Meeks.
Phillips and Doster continued to travel on foot. Late in the afternoon of November 4, the pair ultimately arrived at the VFW Post 3454 “on the river.”[8] Phillips and Doster waited until the club closed, and then Phillips pushed a small fan out of a back window of the building, and climbed inside. Once inside, Phillips opened the door and let Doster inside the building.
Phillips and Doster ransacked the premises. They ate food and drank beverages they found inside. They broke into gaming machines and took an undetermined amount of money. Phillips and Doster also stole a number of items, including whiskey, cigarettes, food, and pain relievers.
The next morning, the break-in was discovered and reported to law enforcement. The value of the items stolen from the VFW Post was greater than $250, but less than $1,000.
After ransacking the VFW Post, Phillips and Doster left the building. Outside, they found a boat, to which they attached a trolling motor. With the stolen items in tow, they got into the boat. The two men then traveled by boat along the river.
Doster knew of a residence where his brother had lived that was located on the river. They rode in the boat to an area near the Gantt Dam, where they abandoned the boat. Phillips and Doster then traveled by foot to the Whispering Pines trailer park, a remote trailer park located on a dirt road in Covington County and within walking distance of the river.
The trailer park was owned by Diane Pettie. At that time, there were only two trailers located in the park. Jason Pettie, Diane Pettie’s son, resided in one trailer, and Paul LeMaster resided in his “fifth-wheel” trailer in the park. Evidence elicited at trial established that at one point in time, Doster’s younger brother had lived with Jason Pettie in his trailer.
Phillips and Doster arrived at Jason Pettie’s mobile home around 1:00 a.m. on the morning of November 5. After discovering that Pettie was not home, they broke into Pettie’s trailer through the back door. Once inside, Phillips and Doster put on dry clothes, ate, slept, took showers, played cards, and consumed alcoholic beverages. At some point, Doster cut Phillips’s hair.
The two men rummaged through Jason Pettie’s gun cabinet, and found a Remington 30-06 rifle with a scope, a 16-gauge shotgun, a 12-gauge shotgun, and two .22-caliber rifles. The cabinet also contained ammunition for the guns, and various other hunting supplies.
While they were hiding out in the trailer, Doster and Phillips noticed that Paul LeMaster had a truck. They discussed various ways that they could get the truck. In Phillips’s confession, he said that Dost-er told him that they had to kill LeMaster in order to take his truck. Phillips claimed that he drank heavily after they decided they would kill LeMaster for his truck.
*982 Late in the afternoon of November 5, Doster loaded the Remington 30-06 rifle and handed it to Phillips so that he could shoot LeMaster. Phillips went to the corner of LeMaster’s trailer and stretched out on the ground. LeMaster had the metal door on his trailer open, but the screen door was shut. Through the scope on the rifle, Phillips watched LeMaster moving about in his mobile home. LeMaster came to the screen door, and as LeMaster turned, Phillips shot him.
Doster and Phillips entered LeMaster’s residence. Phillips cut the pockets on Le-Master’s pants to get the keys to his truck. LeMaster had been cooking before he was shot, so Doster turned off the stove. Phillips told the investigators that Doster took a drawer full of change from LeMaster’s residence.
Phillips and Doster then left in LeMas-ter’s truck. They took with them Pettie’s 30-06 rifle, the two shotguns, a camouflage bucket with a swivel-seat cover — commonly referred to as a “dove bucket” — full of ammunition for the three firearms, some of Pettie’s camouflage clothing, hunting boots, and some of Pettie’s other clothing.
Phillips and Doster had also intended to take some of the various items stolen from the VFW, as well as other items stolen from Pettie’s trailer. These items were placed inside a duffle bag that belonged to Pettie. However, they inadvertently left the bag some 20 feet from LeMaster’s trailer.
Inside the duffle bag were Tom’s brand cheese crackers, packs of cigarettes, packages of peanuts, a carton of Camel-brand cigarettes, “Slim Jim” brand meat-product snacks, packages of “Stanback” brand headache powder, packages of “Goodys” brand headache powder, packages of “Alka-Seltzer” brand antacid, and a bottle of Evan Williams brand whiskey, all of which had been stolen from the VFW Post. Two knives, a pair of binoculars, a flashlight, a sharpening stone, and a pair of socks filled with “silver” change were also found in the duffle bag, all of which were confirmed to belong to Pettie. The value of all the items stolen from Pettie exceeded $1,000.
Jason Pettie testified that he had been working out of town. When he returned to his mobile home in the late afternoon of November 6, he discovered that the door of his mobile home was unlocked. When Pettie entered the mobile home, he saw that it had been ransacked and that the back door to the mobile home was open. His gun cabinet had been emptied. Pennies were scattered on the floor, and two long guns were lying on the floor. Pettie discovered hair on his bathroom floor.
Pettie telephoned the authorities and reported the incident. When law-enforcement personnel arrived at Pettie’s residence, he told them that he was concerned about LeMaster because the lights were on at LeMaster’s residence, but his truck was not there.
Law-enforcement personnel went to Le-Master’s residence, where they discovered his body. An autopsy indicated that Le-Master died as a result of a single gunshot wound.
Pettie stated that he kept coins in a large jug, but that all the coins, except the pennies, had been stolen. He said that a deck of playing cards and a score sheet had been left on his kitchen table. A half-full bottle of Canadian Mist brand whiskey, which was later determined to bear Phillips’s fingerprints, was discovered on an entertainment center in Pettie’s residence. Phillips’s DNA was later recovered from a cigarette butt discovered on the kitchen counter of Pettie’s mobile home.
Phillips and Doster also left behind two sacks of wet clothes that were found on *983 the floor in Pettie’s residence. These were the clothes that Phillips and Doster were wearing when they escaped. Inside one of the bags was a shirt that had the name “Bobby P.” written in the collar.
Immediately after shooting LeMaster, Phillips and Doster went to a convenience store and put gasoline in LeMaster’s truck. From there, they traveled to Laurel Hill, Florida, stopping once in Crest-view, Florida, to get more gasoline and a case of beer. While still in Florida, they removed the camper-shell from LeMas-ter’s truck.
Phillips told the investigators that he and Doster then traveled west on Interstate 10 to Mississippi, where they rented a motel room under the name of “Michael Phillips.” They stayed until the following morning, which would have been the morning of November 6. At some point while they were in Mississippi, Phillips and Doster painted LeMaster’s truck black.
In his statement to the investigators, Phillips said that they then proceeded to Baton Rouge, Louisiana. He stated that while they were in Baton Rouge, they paid a “crack-head” named “Waylon” $150 to pawn Pettie’s 30-06 rifle.
Phillips said that after leaving Baton Rouge, they traveled through Louisiana back to Mississippi, and then to Memphis, Tennessee, and from there to Arkansas.[9] Phillips told the investigators that while they were in Memphis he telephoned his stepmother to ask for help, but she hung up on him when he told her that he thought he had killed a man. Phillips told the investigators that he and Doster spent the night in Brinkley, Arkansas, before returning to Alabama.
Doster and Phillips arrived back in Cov-ington County in the late night hours of November 10 or early morning hours of the November 11. Phillips told the investigators that in the early morning hours of November 11, they drove LeMaster’s truck down a dirt road, into a wooded area in Covington County. They remained hidden in that area for the rest of the daylight hours. While they were parked there, they discarded LeMaster’s paperwork and belongings that were in the truck.
Sometime around dusk, Phillips and Doster drove out of the property. Around 8:00 p.m., they drove to the Florala City Yard, where Doster had worked while on work release. Doster told Phillips that the gates to the city yard were not locked.
Once inside the gated city yard, they parked the truck in a shed. They then broke into a locked building and stole numerous items, including various tools, a toolbox, a crow-bar, a tire-tool, flashlights, motor oil, and gasoline. They also siphoned gasoline out of the city work trucks. They put all the stolen items into LeMaster’s truck. The value of the items stolen was greater than $250, but less than $1,000.
Around 11:00 p.m., Phillips and Doster walked from the Florala City Yard to the nearby Florala High School. They entered the school by removing a window in the back of the building. Once inside the school, they broke into various offices and stole money and two pairs of tennis shoes. All the stolen items had a value of more that $250 but less than $1,000. They ripped the changers from the vending machines and took the money that was in the changers.
*984 Phillips and Doster attempted to take a safe from the principal’s office. They pushed it to the back door, with the intention of driving the truck over and loading it into the truck. However, when they later returned to the school with the truck, they saw a police vehicle parked in the parking lot of the school. Phillips said that when they saw the police vehicle, they slowly made a U-turn and left the parking lot, and then they fled the area.
On the morning of November 12, a Flo-rala City employee discovered the burglary and theft at the city yard, and he contacted the police. On that same morning, the principal of the Florala High School discovered the burglary, thefts, and vandalism at the school, and he contacted the police. The safe that Phillips and Doster tried to remove was still sitting by the doorway.
On November 18, Austin Sholt noticed an open gate on some land that he had leased for hunting purposes off Pete McGhee road. When he entered the gate, he discovered discarded paperwork that had Paul LeMaster’s name on it. Sholt took a sportsman’s license and a fraternal organization card with him to turn over to the police.
On November 14, Sholt came in contact with Jeremy Douglas, who was at that time the chief of police of the town of Lockhart, in Covington County. Chief Douglas was in the process of arresting a subject for driving under the influence, when Sholt approached him and handed him the documents that Sholt had found on the hunting property. Chief Douglas wrote down Sholt’s telephone number, and then Chief Douglas put the papers in his pocket.
On the night of November 15, Chief Douglas was at a convenience store, when he saw a newspaper article about the Le-Master murder in the Gantt area. When he realized that was the name on the papers Sholt had given him, Chief Douglas contacted Covington County Sheriffs investigator Walter Inabinett. Chief Douglas also contacted Sholt, who gave him directions to the hunting property where he had found the papers.
That same night, Chief Douglas, Investigator Inabinett, and several other law-enforcement personnel traveled to the hunting property off Pete McGhee Road. They found discarded paperwork bearing Paul LeMaster’s name, a briefcase, a Ford truck mirror, gun racks, oil bottles, a 30-06 empty shell casing, and various other items. Several days later, Chief Douglas returned to the area and collected two additional bags of items, which he turned over to Investigator Inabinett.
In the meantime, after leaving the Flo-rala High School in the early morning hours of November 12, Doster and Phillips drove to Crestview, Florida, where they rented a motel room. Phillips told the investigators that after leaving Crestview, they drove to New Orleans, Louisiana, where Phillips claimed he intended to seek employment.
Phillips told the investigators that while he and Doster were in New Orleans, they traded the two remaining guns that they had stolen from Pettie for some heroin. Phillips claimed that he then tried to commit suicide by injecting heroin into himself. Phillips said that he was not successful in his suicide attempt because Doster revived him.
Phillips stated that he and Doster left New Orleans and traveled to Baton Rouge, where they stayed in a motel. They returned to Covington County, Alabama, in the late night hours of November 16 or early morning hours of November 17.
When they returned to Covington County, Phillips and Doster traveled down a dirt road to the Conecuh River Baptist *985 Church. They parked LeMaster’s truck behind the church. They broke into the church through a back -window.
Once inside the church, the men rummaged through the pulpit. They tore open a small, wooden replica of the church, which served as an offering box, and took the change from the box. They also stole a roll of duct tape. Phillips and Doster left behind a single leather glove. The mate of that glove was later discovered in LeMaster’s truck.
Phillips and Doster then broke into the fellowship hall of the church, which was in a separate building. They stole a plastic jar of coins from the fellowship hall that some of the children in the church had collected. The value of the items stolen from the church did not exceed $250.
After leaving the church, Phillips and Doster made their way to Pleasant Home Valley School. They broke out a window in the back of the school and went in. Once inside, they broke some windows to the offices using a crowbar from the truck. They used duct tape that had presumably been taken from the church to keep some of the glass from fragmenting when they shattered the windows. Phillips and Dost-er stole some keys to the vending machines. The value of the keys did not exceed $250. In addition, they removed the money changers from the vending machines in order to get the money in the machines. The damage to the vending machines did not exceed $250.
Once again, Phillips and Doster fled Covington County in LeMaster’s truck. On November 18, a Texas state trooper stopped Phillips and Doster as they were traveling west on Interstate 10 in LeMas-ter’s truck. They were arrested on outstanding Alabama felony-arrest warrants.[10]
Phillips and Doster were apprised of their Miranda[11] rights at the scene of the arrest. Phillips had a hand-made identification card bearing a recently made photograph of himself with the name “Michael Phillips” listed on the card. Phillips was wearing a pair of tennis shoes that he had stolen from Florala High School.
Covington County investigators Walter Inabinett and Scott Conner traveled to Texas to interview Phillips. As noted above, Phillips gave a detailed confession to the investigators.[12]
Before speaking with Phillips, the investigators inventoried LeMaster’s truck, which had been towed to the Crockett County, Texas, Sheriffs Department and stored. They discovered items that had been taken from each crime scene.
On November 21, Conner and Inabinett recovered Pettie’s 30-06 rifle from John Windham of the Baton Rouge, Louisiana, Police Department. Windham had recovered the rifle from a pawnshop. A pawn ticket indicated that the rifle had been pawned for $150 to a Cash America Pawn shop by a Waylon Leach on November 13. Leach told Windham that he had pawned the rifle for two men from Alabama. The cartridge casing that was discovered with the other discarded material from LeMas-ter’s truck was subsequently determined to have been fired from the rifle.[13]

*986
Standard of Review

In every case in which the death penalty is imposed, this Court must review the record for any plain error, i.e., for any defect in the proceedings, whether or not the defect was brought to the attention of the trial court. Rule 45A, Ala.R.App.P., provides:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
As this Court stated in Hall v. State, 820 So.2d 113, 121-22 (Ala.Crim. App.1999), aff'd, 820 So.2d 152 (Ala.2001):
“The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is ‘particularly egregious’ and if it ‘seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.’ See Ex parte Price, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Johnson v. State, 620 So.2d 679, 701 (Ala.Cr.App.1992), rev’d on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993).”
Although Phillips’s failure to object at trial will not preclude this Court from reviewing an issue, it will, nevertheless, weigh against any claim of prejudice he makes on appeal. See Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993).

Guilt-Phase Issues

I.
Phillips contends that the State improperly split the single crime of escape into multiple counts in the indictment, which, he claims, resulted in multiple convictions for the same conduct in violation of the prohibition against double jeopardy.[14] Phillips’s double-jeopardy claim stems from circuit court’s denial of Phillips’s pretrial motion to sever the counts of the indictment. Thus, an understanding of what transpired with regard to Phillips’s motion to sever is necessary.
As discussed earlier in this opinion, the Covington County grand jury returned a 23-count indictment against Phillips, charging him with crimes that occurred during a crime-spree that began when Phillips and three other inmates escaped from the Covington County jail on November 4, 2002, and ended when he and his codefendant, Oscar Roy Doster, were arrested in Ozona, Texas, on November 18, 2002. On June 8, 2005, Phillips filed a motion to sever the counts in the indictment “on the grounds that a joint consolidated trial on each of the following counts 1 through 23 of the indictment will inevitably prejudice him and prevent him from receiving a fair trial.... ”
*987 On February 20, 2007, a pretrial hearing was conducted to address various pending motions. During the hearing, the court addressed Phillips’s motion in limine to bar the introduction of prior bad acts, and his motion for the State to disclose to the defense any prior bad acts or crimes that it intended to introduce at trial. During that discussion, the following occurred:
“[PROSECUTOR]: The one thing I would say as far as bad acts go, you know, we’re talking about a multiple week crime — series of crimes that we’re going to be proving in this case, and in what we have produced [for] the counsel already, there are bad acts that are necessarily included. And I don’t think the state has the burden of filtering through all that information and saying, you know, hey, here’s something bad that they did.
“THE COURT: I take this motion [Phillips’s motion for the state to disclose the prior bad acts it intended to introduce at trial] to mean something that didn’t have to do with this time frame, prior convictions from other unrelated events in the past and such as that. Is that not what it’s directed at?”
(R. 884.)
The discussion then segued to Phillips’s motion to sever the counts in the indictment:
“[DEFENSE COUNSEL]: Your Honor, we earlier filed, I believe, a motion to sever for this very reason, to sever — we have 27 — 27 or 26....
[[Image here]]
“[DEFENSE COUNSEL]: Felony counts, not including the capital-murder count and we did an earlier motion ... the Motion to Sever Counts filed on 6/08/05. And the difficulty, what we have is that it kind of relates to this motion for prior bad conduct in that the state is alleging that this is all part of the escape and all part of a common scheme, and if we believe them to be individual separate acts that should be tried separately.
“And so I guess what we would say is, ‘no,’ Your Honor, we would ask that he be tried individually on each one of these counts as a separate act because they happened on separate days; they’re separate circumstances, separate scenes, and this should be to give him an opportunity to stand on the facts alone on each case to sever—
“THE COURT: So you’re saying [there] ought to be 28 different trials?
“[DEFENSE COUNSEL]: Yes, sir.
“[CO-DEFENSE COUNSEL]: If I might one further item, Judge, the principle that we’re moving in on this is we’re trying to prevent from a cumulative effect of 26 or whatever they are felonies all coming to culmination of conviction of capital murder, much of which really have very little, if anything, to do with that accusation. So the principle we are relying on here on these motions and also the Motion to Sever ... is we’re trying to protect our client so that he gets a fair trial based on the evidence presented as to what he is accused of and not accumulation of effect over a time frame, whether it be ten years or two weeks.
“THE COURT: What time frame are we talking about here?
[[Image here]]
“[PROSECUTOR]: Two and a half weeks. Judge in response, we would state that this whole thing started with an escape and that once Mr. Phillips and his codefendants escaped, every act that they did thereafter including the murder is a continuing act to be able to continue their flight from — from imprisonment. Each theft is committed, one to obtain food, drinks; another to obtain firearms; that the capital murder itself to obtain *988 transportation and money; and then the return trips to Covington County, again to obtain money and items that will keep them free and allow them to remain at liberty.
“When they’re ultimately arrested in Texas, search of the vehicle reveals a piece of evidence from every single one of these other thefts. It’s a continuous transaction even though it took place over multiple [two] weeks. Each one of these crimes — also, if you take — obviously, our focus here is the capital murder. Each one of these crimes goes to show motive for why Mr. Lemaster was murdered.”
(R. 884r-38.)
As the discussion continued, defense counsel reiterated the defense’s position that the counts in the indictment should be severed and that each count should be tried separately. Defense counsel argued that the crimes were separate incidences and that the jurors would be confused, overwhelmed, and prejudiced by hearing evidence regarding all the crimes charged. (R. 838-40.)
The prosecutor disagreed, arguing:
“[PROSECUTOR]: In brief response, Judge, I think the exact opposite. Frankly, I think the jury is going to be very intrigued and very on point with each one of these crimes to see how it fits into the whole picture. Every single one of these break-ins, especially, the ones — the thefts, we will be able to connect to the ultimate escape and how they were obtaining items to continue with their escape and how the murder of Mr. Lemaster was just yet one more stop in this ongoing escape.
“Now again, all of these crimes have the same underlying motive and that’s how can Bobby Phillips stay free, how can I remain undetected by the police, how can I survive.
“There won’t be any confusion by the jury. And frankly, they talk about jurors getting outraged by the break-in of a church or the break-in of a school. Something tells me the jurors are probably going to be pretty outraged by the murder more than by these thefts into these other places. But they are important crimes and they’re part of the overall picture.
“This is one ongoing crime that started with the escape and ended with their apprehension in Texas. And a jury is going to be completely and totally confused if you take out those very important steps of what happened in between. And the state can prove those. The state can prove that they’re all linked by motive or the state can prove beyond a reasonable doubt how they’re all connected and that it was a continuing ongoing crime. And so these charges shouldn’t be severed.”
(R. 840-41.)
The circuit court denied the motion to sever. (R. 842-44.)
Rule 13.3(a), Ala. R.Crim. P., provides:
“Two or more offenses may be joined in an indictment, information, or complaint, if they:
“(1) Are of the same or similar character; or
“(2) Are based on the same conduct or are otherwise connected in their commission; or
“(3) Are alleged to have been part of a common scheme or plan.”
In Robinson v. State, 428 So.2d 167 (Ala. Crim.App.1982), Robinson was charged in a two-count indictment with the crimes of robbery and murder. Robinson claimed that his convictions and sentences under both counts entitled him to a mistrial. We disagreed, reasoning:
*989 “[I]t has long been held that murder and robbery may properly be joined in the same indictment under separate counts, as being of the same family or general nature of offenses. Smelcher v. State, 38 Ala.App. 326, 33 So.2d 380 (1947); Sanders v. State, 278 Ala. 453, 179 So.2d 35 (1965). As well, evidence of both offenses was properly admitted since the murder and robbery constituted one criminal transaction made up of two chronologically close criminal acts. Sanders, supra.
“We are mindful of the fundamental principle that a single crime may not be subdivided into multiple offenses, nor a series of charges based on the same act. Baldwin v. State, 47 Ala.App. 136, 251 So.2d 633 (1971); Crosswhite v. State, 31 Ala.App. 181, 13 So.2d 693 (1943). Although combined in one transaction, appellant clearly committed two separate and distinct criminal acts, bearing two criminal intents, i.e., the intent to rob and the intent to kill. Colston v. State, 350 So.2d 337 (Ala.1977); Yelton v. State, 56 Ala.App. 272, 321 So.2d 234, cert. denied, 294 Ala. 745, 321 So.2d 237 (1975). Appellant’s acts, the shooting and the robbery, constituted two criminal offenses or actions. It is legally possible to try and convict a defendant for two or more offenses at one trial where the indictment properly joins several offenses depending upon separate criminal acts or actions. Brooms v. State, 197 Ala. 419, 73 So. 35 (1916).
[[Image here]]
“It is within the province of the jury to return a specific verdict as to each count of an indictment. Murry v. State, 48 Ala.App. 89, 261 So.2d 922 (1972). Where there is evidence of separate and distinct acts constituting separate criminal offenses, separate convictions and sentences may be had under multiple counts of an indictment. Boatner v. State, 8 Ala.App. 361, 63 So. 33 (1913); see Wildman v. State, 42 Ala.App. 357, 165 So.2d 396 (1963), cert. denied, 276 Ala. 708,165 So.2d 403 (1964).
“We find also that appellant’s convictions are in no way violative of Whalen v. United States, 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980).
“Under the present state of the record, we find no reversible error in this regard.”
Robinson, 428 So.2d at 169-70 (emphasis added). See also Green v. State, 599 So.2d 631, 633 (Ala.Crim.App.1991) (consolidation of three indictments for trial was proper where the offenses charged in the indictments were of a similar character and “[t]he offenses charged in the 3 indictments allegedly occurred within a period of 16 days and could arguably be ‘connected in their commission’ within the meaning of [then] Rule 15.3(a)(ii), [Ala.]R.Cr.P. Temp.”); Snell v. State, 677 So.2d 786, 789 (Ala.Crim.App.1995) (trial court did not abuse its discretion in denying motion to sever an enticing a child to enter a house for immoral purposes count from two sodomy counts despite Snell’s contention that “trying the enticement charges with the sodomy charge allowed the jury to hear evidence of collateral bad acts”).
Here, the circuit court denied the motion to sever on the grounds that all the charged offenses were part of a continuous effort by Phillips to elude capture, i.e., that the crimes were connected in their commission and/or they were all part of a common scheme or plan. Rule 13.3(a)(2) and (3), Ala. R.Crim. P. We find no abuse of discretion in the circuit court’s ruling.
On appeal, Phillips now argues that if the crimes charged in the different counts of the indictment are actually part of the single crime of escape as, he claims, the prosecutor alleged at the hearing and the circuit court found, then only his conviction for escape can stand. He contends *990 that the State’s purported “splitting” of the single crime of escape into multiple offenses violates the prohibition against double jeopardy.
Phillips did not present his double-jeopardy claim to the circuit court; rather, this claim is presented for the first time on appeal. However, because this is a case in which the death penalty has been imposed, Phillips’s failure to present this argument to the circuit court does not preclude our review, but it does weigh heavily against his claim of prejudice. Dill, 600 So.2d 343.
In Dedeaux v. State, 976 So.2d 1045, 1048 (Ala.Crim.App.2005), the appellant claimed that “the indictments returned against him were invalid because ‘the splitting of the facts or elements ... to create [multiple offenses violated the prohibition] against Double Jeopardy.’ ” This Court rejected Dedeaux’s argument, stating:
“Alabama law prohibits a single crime from being divided into two or more offenses and thereby subjecting a defendant to multiple convictions for the same offense. Ex parte Darby, 516 So.2d 786, 787 (Ala.1987). However, Alabama law clearly pemits multiple punishments for multiple statutory offenses occurring out of the same course of events. When determining whether two offenses constitute the same offense for double-jeopardy purposes, this Court looks to see whether each offense contains an element not contained in the other. United States v. Dixon, 509 U.S. 688, 697, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993) (citing Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932)). In Ex parte Dawson, 675 So.2d 905 (Ala.1996), the Alabama Supreme Court held that double jeopardy did not preclude imposition of four separate consecutive life imprisonment sentences for burglary, robbery, rape, and sodomy convictions that arose out of a single continuing transaction in which separate offenses were committed, stating:
“ ‘[T]he United States Supreme Court held that multiple punishments for multiple statutory offenses do not violate the prohibition against double jeopardy where each statutory offense requires proof of an additional fact that the other statutory offenses do not require. Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). In other words, as long as each statutory offense requires proof of additional facts, the double jeopardy prohibition is not implicated.’
“675 So.2d at 907. Here, each statutory offense required proof of additional facts not contained in the other offenses. Accordingly, Dedeaux’s double-jeopardy claim is without merit.”
Dedeaux v. State, 976 So.2d at 1048 (emphasis added).
In this case, Phillips misconstrues both the prosecutor’s argument and the circuit court’s rationale for denying the motion to sever. Despite Phillips’s contention to the contrary, the State did not split the single crime of escape into multiple counts in the indictment and thereby subject Phillips to multiple convictions for the same conduct. Although the prosecutor may have inadvertently used the phrase “one continuing ongoing crime,” or some other similar phrase, in his argument against the motion to sever, the clear implication from the prosecutor’s argument is that he meant that all the crimes were part of one continuous crime spree perpetrated by Phillips in order to elude capture, not that the multiple offenses were one single continuous crime of escape. The circuit court understood this to be the prosecutor’s contention when the court denied the motion to sever.
*991 Each count, although connected in its commission to the other counts in the indictment as part of a crime spree perpetrated by Phillips in an effort to elude capture, is nonetheless a separate and distinct offense requiring proof of an element that the other did not. As stated above, “Alabama law clearly permits multiple [convictions] for multiple statutory offenses occurring out of the same course of events.” Dedeaux, 976 So.2d at 1048. Accordingly, Phillips is due no relief on his double-jeopardy claim.
II.
Phillips next argues that the circuit court erred in denying his motion to depose the State’s expert witnesses.[15] Phillips maintains that because he was charged with capital murder, he was entitled to expanded discovery pursuant to Ex parte Monk, 557 So.2d 882 (Ala.1989), and that pretrial access to the State’s expert witnesses was necessary in order to adequately prepare his defense.
Before trial, the defense filed two written motions seeking permission to depose the State’s expert witnesses, at the State’s expense. In the motions, the defense also requested that the State furnish documentation regarding the credentials and qualifications of the State’s expert witnesses.
When the motions were addressed at a pretrial motion hearing, the following occurred:
“[PROSECUTOR]: Judge, we would object to this objection [sic]. There is no statutory or case law of grounds for them to be allowed to depose any state experts. There are deposition statutes that exist and under those statutes their request does not fall.
“One thing we would point out to Your Honor, this is a capital-murder case. Because of that fact, we have had open-file discovery since the beginning of this case for counsel. We’re under a duty to produce everything that’s not only in our file but that is in the file of all police officers. We have taken strides to make sure that they have a complete copy of all lab notes and everything from all of our State experts so that they basically have everything that we have. They will have ample information from which to cross-examine our state people. In fact they’ll have the same thing we have.
“The Court: You got any specifics?
“[DEFENSE COUNSEL]: I would make note, Judge, if I might, that in this case we’re discussing some extensive geographical areas that are involved. Not only is this a capital case where the defendant faces death as a potential punishment, but also we are facing a situation where we as a defense and our client who is indigent is being faced with contesting the full weight of the State of Alabama, the full weight of the county of Covington, the full weight of really of the State of Texas and two counties there that — where our client has the means to be able to test that evidence, in particular if there’s going to be an expert that will come in and give testimony that ... will be harmful to my client. We should have that right. My client should have had that right to be able to defend that. The only way we can do that, Judge, is if we have the opportunity to do depositions of those experts.
“THE COURT: I understand your argument about that, but at this particular time have they notified you about an expert?
[[Image here]]
“[DEFENSE COUNSEL]: None of which that has not already been specified. What my anticipation was any experts as far as forensics that may deal *992 with how or when a shot may have occurred, anything as far as ballistics. Do we have anything on those yet?
“[PROSECUTOR]: Everything that we have, you have.
“[DEFENSE COUNSEL]: And I don’t contest that at all.
“THE COURT: What I’m driving at is as opposed to a blanket order just saying you can do whatever you want to whenever you want and the State is going to pay for it, I think that, like this testing of individual evidence, would have to be brought out.
[[Image here]]
“[PROSECUTOR]: The law as far as what the penalty is in this case and the seriousness of it, the protections are in place. And the protections charge us with open-file discovery, and we have done that from the very outset of this game. I mean, from the very beginning we have provided everything that we have. When we get it, we send it over there to them. We have taken measures, contacted forensics, say hey, we need a copy of your whole file; we send it to them.
“As far as a deposition goes, that is a totally different matter that usually is saved for very extraordinary circumstances in a criminal case. This is not one of those circumstances, and the statute is very clear on it.
“[DEFENSE COUNSEL]: Judge, if I might, we’re not asking to do this on every single witness or every single factual witness that may be called. All we are looking for is if there’s going to be a witness called that is an expert in a particular area that we have — should have the right to fully investigate and depose that individual as to what his testimony may be so that we can prepare and defend against it....”
(R. 448-52.)
As the discussion continued, the prosecutor argued that in the event defense counsel were to have any questions regarding the expert witnesses’ reports or credentials, defense counsel should first try to resolve the issue through less formal means, such as contacting the person who prepared the report and discussing the matter with that person.
The following discussion then ensued:
“[DEFENSE COUNSEL]: If they [experts] will speak to us.... I’m willing to do this on a case by case basis, Judge, if need be. If we run into that difficulty with the forensic or ballistic or anyone else, we would like to have the opportunity to come before the judge and present that.
“THE COURT: You can certainly make a motion for anything you feel like you’re entitled to, but I’m not going to grant that just cart blanche. I just have to wait and see what y’all come up with.
“[DEFENSE COUNSEL]: All right, sir.”
(R. 454-55.)
On February 20, 2007, another pretrial motion hearing was conducted. When the motion to depose the State’s expert -witnesses was readdressed, defense counsel indicated that the defense had received the documents it requested in the motions. With regard to deposing the State’s expert witnesses, counsel indicated that the defense would “submit [the motions] as presented already.” Defense counsel did not present any additional arguments or specifics in support of the motions to depose the State’s expert witnesses.
In Belisle v. State, 11 So.3d 256 (Ala. Crim.App.2007), aff'd, 11 So.3d 323 (Ala. 2008), cert. denied, — U.S. -, 129 *993 S.Ct. 2865, 174 L.Ed.2d 582 (2009), also a capital-murder case involving imposition of the death penalty, this Court addressed the same argument. We concluded that the court did not err in denying Belisle’s request to depose the State’s expert witnesses, reasoning:
“Belisle filed a discovery motion pursuant to Ex parte Monk [, 557 So.2d 832 (1989) ]. The circuit court granted the motion and allowed Belisle access to the prosecution’s entire case file. Belisle also moved to inspect all of the physical evidence that had been collected by the State. At the bottom of this motion the circuit court wrote: ‘Resolved by agreement, but if anything needs testing, defendant to file motion with respect to that particular item of evidence.’ Beli-sle also moved that he be given access to all of the materials involving polygraph tests that had been administered to any witnesses. That motion was also granted. Also, the circuit court did grant a motion to conduct a videotaped deposition of the coroner who performed the autopsy on Moore.
“In Wilson v. State, 111 So.2d 856, 926 (Ala.Crim.App.1999), we addressed a similar issue and stated:
“ ‘The appellant’s eighteenth argument is that the trial court erred when it denied him discovery that was allegedly critical to his defense. Specifically, he contends that the trial court should have granted his motion to depose the State’s expert witnesses before trial so he could adequately prepare his defense. Although it denied the appellant’s motion to depose the State’s expert witnesses, the trial court did order the State to identify the expert witnesses it intended to call at trial and to produce the curriculum vitae, certificates, qualifying documents, and other background documents necessary for the defense to assess the qualifications of the experts. (C.R. 115.)
“ ‘ “In Alabama, there is no constitutional right to discovery in a criminal case. Rule 16, Alabama Rules of Criminal Procedure, affords an accused, a limited right of discovery in a pending criminal action. The extent of discovery is within the discretion of the trial court.”
“ ‘Ex parte Land, 775 So.2d 840 (Ala. Cr.App.1998), overruled on other grounds, 775 So.2d 847 (Ala.[2000]). See also Pace v. State, 714 So.2d 320 (Ala.Cr.App.1996), rev’d in part, 714 So.2d 332 (Ala.1997), cert. denied, 523 U.S. 1051, 118 S.Ct. 1372, 140 L.Ed.2d 520 (1998); Bass v. State, 417 So.2d 582 (Ala.Cr.App.), writ denied, 417 So.2d 588 (Ala.1982). Rule 16, Ala. R.Crim.P., does not specifically provide that every criminal defendant is entitled to depose the State’s expert witnesses. In this case, the appellant has not shown that deposing the State’s expert witnesses was critical to his defense. During the discovery process, he received documentary evidence from which he could prepare to impeach the credibility, training, and expertise of, as well as the conclusions reached by, the State’s expert witnesses. Furthermore, the experts did not testify about highly technical or “arcane” subject matter as the appellant alleges. Therefore, the appellant has not shown that the trial court abused its discretion in denying his request. See Maples v. State, 758 So.2d 1 (Ala.Cr.App.1999).’
“For the foregoing reasons, we find no error.”
Belisle, 11 So.3d at 273-74.
In this case, the prosecutor maintained an “open-file” policy with regard to discovery matters — the record indicates that *994 pursuant to the defense’s discovery request, the State filed an answer that included approximately 700 pages, and that the State’s answer was amended with additional discovery material no less than 12 times before trial. Phillips does not suggest that the prosecutor withheld any discoverable material pertaining to the expert witnesses. In fact, Phillips indicated to the circuit court that the defense had received the documents it had requested regarding the expert witnesses.
Furthermore, the circuit court did not unequivocally deny Phillips’s motions to depose the expert witnesses; rather, the court indicated that it would be willing to revisit the issue should the defense be unable to resolve any issues it had through means less formal than a deposition at the State’s expense. Whether the defense actually contacted the State’s expert witnesses is not apparent from the record, but there is no indication that the defense was precluded from doing so, or that the defense met with any resistance if it did do so.
Phillips did not inform the court of a specific witness he wished to depose or how he would be prejudiced if he were not allowed to depose the witness, even when the defense was given an opportunity to revisit the issue. Accordingly, any prejudice that Phillips suffered as a result of the court’s ruling on his motions is not apparent to this Court.
For the foregoing reasons, we find no error in the circuit court’s ruling.
III.
Phillips contends that he was entitled to a copy of the transcript of the trial of his codefendant, Oscar Roy Doster, and that the circuit court should have continued his trial until a completed copy of Doster’s transcript was provided for his review.[16]
The record indicates that on August 23, 2006, Phillips, who was granted indigent status, filed a written motion entitled, “Motion for Discovery of Transcript, Exhibits and Other Documentation of the Co-Defendant, Oscar Roy Doster’s Trial, or in the Alternative, Grant Extra Ordinary Expenses to Purchase Transcript.” In the motion, Phillips wrote that Doster’s trial began on August 21, 2006, and that many of the same witness from Doster’s trial would be testifying at his trial. Phillips argued that in order to adequately prepare his defense, he needed access to the transcripts and exhibits from Doster’s trial. As additional support for his motion, Phillips wrote:
“The imbalance in this case makes the issue particularly clear: The prosecution was present when the witnesses testified in the Co-Defendant’s trial, and therefore knows (or purports to know) what they said. The prosecution will be provided a transcript of the Doster Trial, the Co-Defendant Bobby O’Lee Phillips also needs access to this possible exculpatory and/or contradictory sworn testimony. ...”
(C.1946.)
At a pretrial motion hearing conducted on February 20, 2007 — six days before Phillip’s trial began — the following discussion occurred:
“[DEFENSE COUNSEL]: ... We also filed a motion and obtained an order from this court for discovery of all the exhibits and documentation of the Oscar Doster — Oscar Doster’s trial that occurred back in October last year. It is my understanding that those transcripts are not complete and that they will [not] be complete before we start trial.
“To be blunt, Judge, we were counting on those. Since we don’t have those, *995 I’m going to verbally make a motion that we continue this trial until we’re able to obtain those transcripts and then we can move forward into the trial phase.
“[PROSECUTOR]: One thing I’d say in response, Judge, is I don’t know how many days counsel was present but I do know for a large majority of the trial one of or the other of defense counsel was present in the courtroom taking notes while testimony was on-going.
[DEFENSE COUNSEL]: I would also — and Mr. [PROSECUTOR], you have also filed a motion for the same, have you not?
[[Image here]]
“[PROSECUTOR]: No. I knew it was a very voluminous transcript and I knew it wouldn’t be prepared in time for the trial, so I didn’t bother to try to get it.
[[Image here]]
“THE COURT: Have you spoken to the court reporter?
“[DEFENSE COUNSEL]: No, sir, personally I have not.
“[CO-DEFENSE COUNSEL]: Your Honor, I have and she’s just swamped. She really tried hard to get it ready for this time .... there’s just no way.... She even tried to stick with a lot of the testimony which we believe will be very similar or be exactly the same from a lot of the Doster trial. That’s why we wanted it was to make sure that the testimony was the same. But ... she’s just not able to do it with the entire proceedings that has been appealed.
“[DEFENSE COUNSEL]: I’m sure the court is aware this is a matter where you have two codefendants being tried on the exact same items and it would be remiss of us as defense if we did not have an opportunity to look at if there’s any change in testimony between the same witnesses on the same matters.
[[Image here]]
“[PROSECUTOR]: Judge ... I can’t think of a witness that testified at that trial that the defense does not already have in their possession either a statement or a record that covers at least a summary of the substance of what their testimony was in the Doster trial.
“Now whether there were contradictions .... I don’t recall anything glaring because I don’t recall defense counsel in that trial jumping up and down about it on cross. You know, that’s about as far as I can go with it. They’ve got everything we’ve got. And they’ve got all of the records, chain of custody and reports and statements and everything in our file they’ve got.
[[Image here]]
“Just one other thing.... The State is at equal/unequal [sic] footing without the transcript too. It would be great if I could have it. Then I would know exactly what my witnesses testified to in the last trial. But I don’t and — but I do have my file, and it doesn’t stop me from getting ready for trial. And we tried Doster’s case without any prior trial transcript and managed to pull it off fine. The defense was able to defend their client fine. I don’t see why the same shouldn’t apply here.
“THE COURT: All right.... I’ll think about that one.”
(R. 852-55.)
A short time later, the discussion returned to the Doster transcript:
“[CO-DEFENSE COUNSEL]:.... The reason why the transcript was so important is [Doster’s defense counsel’s] defense was that Bobby Phillips is the shooter. And I believe that testimony, the State’s testimony, is either going to deny that or confirm that. And so the reason we wanted the transcript was to make sure that the — we don’t have any witness that says the testimony reveals *996 one thing and then turn around and say that Doster was as — is as culpable as Mr. Phillips or that Doster had a large role in this and that. Those types of statements. Then if they are changed, we wanted to have the ability to be able to say, well, wait a second; you testified this way in Mr. Doster’s case and now you’re saying that it’s Mr. Phillips. And that’s the reason why—
“THE COURT: I thought you just said they said in that case it was Mr. Phillips?
[CO-DEFENSE COUNSEL]: They did. That was the defense of, I believe [Doster’s defense counsel]. And it was — they—they kept hammering at that. I believe the State ... did a very good job to show how Mr. Doster was implicated in this. Whereas in this case, they’re going to be trying—
“THE COURT: The state’s evidence in that case was not that Mr. Doster did the shooting?
“[CO-DEFENSE COUNSEL]: They said that — I guess /all witness [sic] or it was that he was an accessory after the fact or an accessory—
“[PROSECUTOR]: No, not at all. Our evidence was and going into it was that Mr. Phillips was the shooter and that Mr. Doster was — an accomplice to it, that he knew about it and that he had the intent that it occurred and he acted as an accomplice, a knowing accomplice to the intentional murder committed by Mr. Phillips.
“THE COURT: So if there’s a change from that, it’s to your benefit.
“[CO-DEFENSE COUNSEL]: Yes, sir.
“[PROSECUTOR]: We obviously don’t expect a change from it because it’s the truth.
“THE COURT: All right.
“[PROSECUTOR]: One thing I do want to ask just so we have it on the record: Do ya’ll want to continue this case? I mean does Mr. Phillips want this case—
“DEFENDANT PHILLIPS: All the way.
“[PROSECUTOR]: You do?
“DEFENDANT PHILLIPS: Yes, sir.
“THE COURT: All right. I’ll take that under advisement....”
(R. 857-859.)
Later in the hearing, during a discussion about a different motion, the prosecutor noted with regard to Doster’s trial:
“[T]he state and the defense stipulated to most of the forensic reports, the DNA report, the fingerprint reports, the ones that are most culpatory to your client. So those experts did not testify though the reports were entered in evidence.”
(R. 861.)
Phillips argues on appeal that “the particularized need of preparing for impeachment of prosecution witnesses should suffice, to obtain a free copy of a transcript or funds to purchase said transcript.” (Phillips’s brief, at 13.)
In the capital-murder case of Grayson v. State, 824 So.2d 804 (Ala.Crim.App.1999), this Court addressed Grayson’s claim that the trial court erred in refusing to supply defense counsel with copies of the trial transcripts of his three codefendants. When Grayson made his request for the transcripts, none of his three accomplices had been tried yet, so his request was made before the existence of any transcripts. Like Phillips, Grayson argued that the transcripts of the codefendant’s trials were necessary in order to adequately prepare his defense.
Although quite lengthy, because of its relevance to the present case, we quote extensively from Grayson:
*997 “On appeal, the appellant cites the United States Supreme Court’s decision in Britt v. North Carolina, 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971), to support his argument that he was entitled to these transcripts.
“‘The United States Supreme Court in Britt v. North Carolina, 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971), ruled that a state must provide an indigent defendant with a transcript of his earlier trial if a transcript is needed for an effective defense. The Britt court recognized that whether the request for a free transcript should be granted depends on two factors: (1) the value of the transcript to the defendant and (2) the availability of alternative means which would fulfill the same function as a transcript. The Court indicated that, as to the first factor, the defendant need not show that a transcript of his earlier trial would be valuable to him:
“ ‘ “... Our cases have consistently recognized the value to a defendant of a transcript of prior proceedings, without requiring a showing of need tailored to the facts of the particular case.... [E]ven in the absence of specific allegations it can ordinarily be assumed that a transcript of a prior mistrial would be valuable to the defendant in at least two ways: as a discovery device in preparation for trial, and as a tool at the trial itself for the impeachment of prosecution witnesses.” (Emphasis added, footnote omitted.) 404 U.S. 228, 92 S.Ct. 434, 30 L.Ed.2d 404.’
“People v. Brown, 126 Mich.App. 763, 765-66, 337 N.W.2d 915, 916-17 (1983). However, the Michigan court in People v. Brown determined that the holding in Britt v. North Carolina, supra, did not apply to the case before it because the circumstances were factually distinguishable. The Brown court stated:
“‘This case, however, is distinguishable from Britt in a critical respect. In Britt, the defendant requested a transcript of his own earlier trial. In this case, the defendant asked for a copy of the transcript of her codefen-dant’s trial. A situation similar to the one we confront in the instant case, however, was presented to this Court in People v. Kelley, 49 Mich.App. 720, 212 N.W.2d 750 (1973). In Kelley, three men, Clark, Hall and Kuykendall, were convicted of the murder of David Lipton. At the trial, several witnesses testified, including Sue Valentine who saw the assailants seconds before the murder. Subsequently, the convictions were vacated on the prosecutor’s motion and the murder investigation was reopened. Five persons, including the defendant, were then charged with the murder. The defendant was tried separately from the other four and after the people had secured their convictions. Prior to his trial, the defendant moved for the production of the transcript of the trial of the original three suspects. Only the testimony of Sue Valentine was produced. The defendant was later convicted of the murder. On appeal, the defendant argued that the failure to produce the entire transcript was error. This Court disagreed, reasoning as follows:
“ ‘ “[W]e perceive the prior testimony sought, but not produced, did not establish crimination of defendant, but only the corpus delicti of the incident, an issue which defense counsel practically conceded at the outset of trial. Moreover, the testimony defendant sought to be produced did not even criminate Clark, Hall, Kuykendall. Of those who *998 testified in both trials, only Sue Valentine’s testimony tended to establish the guilt of any particular person. Thorough examination of the record reveals defense counsel was well versed in the details of the evidence produced in the prior trial, and we are not satisfied that transcription of the testimony there adduced was the only means for obtaining that information.
[[Image here]]
“ ‘ “[W]e decline to rule that production of prior testimony establishing a rather mundane corpus delicti of the same crime in another case against another defendant is necessary in order to prove a subsequent defendant with a fair trial.”
“ ‘In effect, the Kelley Court, which examined the value that the transcript would have to the defendant, abandoned Britt’s presumption that a requested transcript would be valuable to the defendant. Kelley seems to require a particularized showing of need where a defendant requests a transcript of a proceeding held in a case to which he was not a party.
“ ‘The present case is distinguishable from Kelley. Here, the defendant requested a transcript of the trial of her codefendant. Clark, Hall and Kuykendall, however, were not Kelley’s codefendants, even though they were charged with the same crime. Nevertheless, courts in other jurisdictions have required a showing of particularized need where a defendant requests a transcript of a proceeding involving a codefendant. The position taken by the Court in State v. Razinha, 123 Ariz. 855, 358, 599 P.2d 808, 811 (App.Ct.1979), is typical:
“ ‘ “We do not believe a contention that the transcript of the trial of a third person is needed before an effective defense can be rejected out of hand merely by saying that no case has so held. Instead, the two-pronged test of necessity set forth in Britt must be applied to the facts. However, the first prong of the test, the value to the defendant, cannot be assumed as it was in Britt. There must be a showing of specific need. A mere showing that the prior trial was that of a co-defendant is not sufficient. [Citations omitted.] The reason for distinguishing between the Britt situation, a prior mistrial, and a situation analogous to the one here, a trial of a co-defendant, is that the witnesses may not be common. Even if they are, their testimony as to the co-defendant may differ greatly from their proposed testimony concerning the defendant’s part in the crime, depending upon the circumstances of each case.”
“ ‘We agree and hold that where a defendant requested that the state provide him with a free transcript of the separate trial of a codefendant, the defendant must show that that transcript will be valuable to him.
“ ‘In the present case, defendant did not show in the trial court and does not show on appeal how the transcript of the Audison trial would have assisted in trial preparation or impeaching witnesses. Therefore, we hold that the trial court did not err in denying defendant’s motion for the production of portions of the Audison trial transcript.’
“126 Mich.App. at 766-69, 337 N.W.2d at 917-18. Thus, where a defendant requested a transcript of a proceeding involving a codefendant, to which he was not a party, a number of jurisdictions have required a showing of particularized need. See People v. Russell, 7 Ill. *999 App.3d 850, 289 N.E.2d 106 (1972) (holding that a defendant was entitled to a transcript of the trial of codefendants who were tried together and convicted, where one of the convictions was reversed on the ground of reasonable doubt).
“Similarly, in State v. Tison, 129 Ariz. 526, 633 P.2d 335 (1981), the appellant claimed that the trial court erred by denying his request for transcripts of an accomplice’s trial conducted immediately prior to the appellant’s trial, where the accomplice had been charged with the same substantive charges made against the appellant. The Supreme Court of Arizona distinguished that case from Britt v. North Carolina, supra, stating that, because the indigent defendant was requesting a transcript of a codefen-dant’s trial, he should have shown a specific need. Moreover, the Court in State v. Tison noted the Britt Court’s decision to affirm the lower court’s judgment although the defendant did not receive the transcripts, was based on the availability of an alternative substantially equivalent to a transcript, and found that the evidence in its case indicated that the transcript was not available to anyone because no transcript had been prepared before the appellant’s trial. The Supreme Court of Arizona held as follows:
“‘The United States Supreme Court in Britt v. North Carolina, 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971), held that an indigent defendant must be provided with transcripts of a prior trial that ended in a mistrial without showing a specific need. The necessity of the transcripts to an effective defense was to be presumed. But in an analogous situation, the Court through Justice Rehnquist said:
“ . [T]he fact that particular service might be of benefit to an indigent defendant does not mean that the service is constitutionally required. The duty of the State under our cases is not to duplicate the legal arsenal that may be privately retained by a criminal defendant in a continuing effort to reverse his conviction, but only to assure the indigent defendant an adequate opportunity to present his claims fairly in the context of the State’s appellate process.” Ross v. Moffitt, 417 U.S. 600, 616, 94 S.Ct. 2437, 2447, 41 L.Ed.2d 341 (1974).
“ ‘Hence, when the indigent defendant requests a transcript of a co-defendant’s trial, its necessity to an effective defense is not presumed. Rather, a defendant must show specific need. State v. Razinha, 123 Ariz. 355, 359, 599 P.2d 808 (App.Ct.1979). In distinguishing Britt, the court in State v. Razinha said:
“ ‘ “The reason for distinguishing between the Britt situation, a prior mistrial, and a situation analogous to the one here, a trial of a co-defendant, is that the witnesses may not be common. Even if they are, their testimony as to the co-defendant may differ greatly from their proposed testimony concerning the defendant’s part in the crime, depending upon the circumstances of each case.” 123 Ariz. at 358, 599 P.2d 808.
“ ‘While the witnesses were the same in Greenawalt’s and appellant’s trials, there must still be a showing of specific need. No such need was established. Appellant did not and does not on appeal elaborate on how the transcripts would have assisted in either trial preparation or impeaching witnesses.
*1000 “ ‘More important, as stated in State v. Littles, 123 Ariz. 427, 429, 600 P.2d 40 (App.1979):
““‘Britt does not stand for the proposition that an indigent defendant is absolutely entitled to a transcript of the prior proceedings under all circumstances. It is only where the transcript is available to others for a price that the principles of Britt apply. Here, the transcript was not available to anyone. We do not believe that under the circumstances the trial court was required to delay the trial some unknown time in the future in order to secure the transcript.”
“ ‘Randy Greenawalt’s trial was completed on February 16, 1979. Appellant’s trial commenced February 20, 1979 and ended February 27. It appears the transcripts of Greena-walt’s trial were not prepared and available until May 4,1979. The transcripts not being available to others, they were not required to be provided to appellant.’
“State v. Tison, 129 Ariz, at 540-41, 638 P.2d at 349-50.
“In the present case, the appellant’s trial began on January 29, 1996; he had made his request for the transcripts on October 16, 1995. This Court’s records indicate that the transcripts of the appellant’s accomplices were completed and submitted to this Court on the following dates: Trace Duncan on October 23,1996; Kenny Loggins on January 13, 1997; and Louis Mangione on November 20,1996. Thus, the records the appellant sought were not available for at least a year following his request.
“In Alabama, this Court has previously declined to apply Britt v. North Carolina, supra, beyond the circumstances wherein an indigent requested a copy of the transcript of his prior proceedings where the transcript was shown to be valuable to the defense and a functional alternative existed. In McKinney v. State, 665 So.2d 209 (Ala.Cr.App.1995), the appellant, a juvenile being prosecuted as an adult, had requested funds to secure a transcript of his juvenile transfer hearing. This Court found no error in the trial court’s denial of the appellant’s request because the record indicated that the appellant had access to, yet had failed to take advantage of, alternatives to the requested transcript. Moreover, the Court noted that there was no indication that the prior proceedings were transcribed, because Rule 20(A), Ala.R.Juv.P., does not require a court reporter at these proceedings. In arriving at this decision, this Court stated:
“ ‘Although Britt provides that the value to the defense of a transcript of prior proceedings may usually be presumed, this court has not extended the rationale of Britt so far as to recognize the value that a transcript of proceedings in juvenile court may have in every case where a defendant is transferred to the circuit court for trial as an adult. A juvenile transfer hearing is in the nature of a preliminary hearing. O.M. v. State, 595 So.2d 514, 517 (Ala.Cr.App.1991), cert. quashed, 595 So.2d 528 (Ala.1992). This court has held “[a]n indigent defendant is not entitled to a free transcript of the testimony taken at his preliminary hearing.” Leonard v. State, 369 So.2d 873, 875 (Ala.Cr. App.), cert. denied, 369 So.2d 877 (Ala. 1979).’
“665 So.2d at 211.
“Similarly, in the instant case, there was no error in the trial court’s failure to apply Britt v. North Carolina to a situation where a defendant is seeking to obtain the transcripts of the trials of *1001 his codefendants. If these transcripts were to contain exculpatory information, then the appellant would certainly be entitled to that information under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). There is no indication on appeal, however that these transcripts contained any exculpatory information. Moreover, the trial court suggested that the appellant could have used tapes of these proceedings as an alternative. The appellant has made no showing of any particularized need for these transcripts, and as they were not completed prior to the appellant’s trial, they were not available to either party at any price. For these reasons, there was no error by the trial court in denying the appellant’s motion.”
Grayson, 824 So.2d at 823-27 (footnote omitted).
Contrary to Phillips’s assertion, the prosecutor and defense counsel in this case were not on “unequal footing” with regard to access to the transcript. This Court’s records indicate that Doster’s record on appeal was filed with this Court on August 3, 2007, well after Phillips’s trial concluded in March 2007. Accordingly, the transcripts from Doster’s trial were not available to either party before Phillips’s trial “at any price.” Grayson, 824 So.2d at 827.
Furthermore, because Phillips was seeking the trial transcript of his codefendant, the value of the transcript to Phillips’s defense will not be presumed as it would have been if Phillips were seeking a transcript from a prior mistrial in which he were the defendant. Thus, because the presumption afforded an indigent defendant seeking a transcript of his own prior trial is not applicable here, Phillips had the burden of establishing the value of the transcript to his defense.
Phillips has made “no particularized need for these transcripts” on this appeal. Grayson, 824 So.2d at 828. There is no indication that those transcripts contained any exculpatory information. As the prosecutor indicated in the motion hearing, the prosecution was under a continuing duty to disclose any exculpatory information to the defense, and there is no assertion with regard to this issue that the prosecutor failed to comply with this duty.
Furthermore, there is no indication that the transcript itself contained any exculpatory information. According to the discussions that took place regarding this motion, much of the forensic reports were admitted without testimony, by stipulation of the parties. Thus, there would be no transcript of a witness’s testimony regarding those reports to use for possible impeachment purposes in Phillips’s trial.
Last, we note that one or both defense counsel were apparently present during portions of Doster’s trial and purportedly took notes regarding the proceedings, and there is no indication that the circuit court would have prohibited defense counsel from referencing their notes during Phillips’s trial. Thus, there was an alternative to Doster’s trial transcript. Contrast Quick v. State, 825 So.2d 246 (Ala.Crim. App.), cert. denied, 825 So.2d 263 (Ala. 2001) trial court denied defense counsel’s request for transcripts from Quick’s former trial that ended in mistrial, but trial court would not allow defense counsel to use notes from prior trial to impeach witnesses; thus, defense did not have adequate alternative to transcript).
For these reasons, the circuit court did not err in refusing to continue the trial pending completion of Phillips’s accomplice’s trial transcript.
IV.
Phillips contends that the circuit court erred in denying his pretrial “Motion to Require Disclosure of Any and All Information Concerning Prospective Jurors *1002 that May Be Favorable to the Defense,” in which he essentially requested that the State furnish him any information that would render a prospective juror unfit to serve. Phillips asserts that the circuit court’s denial of his motion “enabled the District Attorney to withhold information about jurors and rely on that withheld information in striking them.”[17]
“ ‘This court has held that arrest and conviction records of potential jurors do not qualify as the type of discoverable evidence that falls within the scope of Brady [v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ] and that a trial court will not be held in error for denying an appellant’s motion to discover such documents. Slinker v. State, 344 So.2d 1264 (Ala.Cr.App.1977). Cf., Clifton v. State, 545 So.2d 173 (Ala.Cr.App. 1988) (the nondisclosed evidence was not exculpatory, thus Brady was inapplicable). In other words, the appellant does not have an absolute right to the disclosure of the arrest and conviction records of prospective jurors. See Slinker, supra. Cf., Davis v. State, 554 So.2d 1094 (Ala.Cr.App. 1984), aff'd, 554 So.2d 1111 (Ala.1989), rehearing overruled, 569 So.2d 738 (Ala.1990), cert. denied, 498 U.S. 1127, 111 S.Ct. 1091, 112 L.Ed.2d 1196 (1991) (defendant is not entitled to the general disclosure of the criminal records of the state’s witnesses); Wright v. State, 424 So.2d 684 (Ala.Cr.App. 1983) (no absolute right to disclosure of criminal records of state’s witnesses).
“ ‘Several jurisdictions have similarly held. See, e.g., People v. Murtishaw, 29 Cal.3d 733, 175 Cal.Rptr. 738, 631 P.2d 446 (1981), cert. denied, 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 464 (1982) (trial judge has discretionary authority to permit defense access to jury records); Moon v. State, 258 Ga. 748, 375 S.E.2d 442 (1988), cert. denied, 499 U.S. 982, 111 S.Ct. 1638, 113 L.Ed.2d 733 (1991) (trial court did not err in denying defendant’s motion for pretrial discovery of state’s juror information records); State v. Wiggins, 556 So.2d 622 (La.App.1990) (defendant is not necessarily entitled to “rap sheets” of prospective jurors); State v. Weiland, 540 So.2d 1288 (La. App.1989) (defendant is not entitled to rap sheets of prospective jurors because those records are useful to state in its desire to challenge jurors with inclinations or biases against state, but are not pertinent to purpose of defendant’s voir dire: to challenge jurors who defendant believes will not approach the verdict in a detached and objective manner); State v. Childs, 299 S.C. 471, 385 S.E.2d 839 (1989) (no right to discovery of criminal records of potential jurors absent statute or court rules requiring such disclosure); Jeffrey F. Ghent, Annot., Right of Defense in Criminal Prosecution to Disclosure of Prosecution Information Regarding Prospective Jurors, 86 A.L.R.3d 571, § 4(a) (1978), and the cases cited therein.
“ ‘Also, the state has no duty to disclose information that is available to the appellant from another source. Hurst v. State, 469 So.2d 720 (Ala.Cr. App.1985). Here, the appellant could have procured this information from the veniremembers themselves during voir dire. See also Clifton, supra (nondisclosure did not prejudice appellant’s defense).’
“Kelley v. State, 602 So.2d 473, 477-78 (Ala.Cr.App.1992). Because the appellant had no absolute right to this infor *1003 mation, and this information could have been learned from the veniremembers directly, there was no error on this ground.”
Arthur v. State, 711 So.2d 1031, 1080 (Ala. Crim.App.1996). See also, Vanpelt v. State, [Ms. CR-06-1539, December 18, 2009] — So.3d-,-(Ala.Crim.App. 2009).
The record indicates that the defense and the State conducted voir dire of the venire as a group and that respective counsel also conducted extensive individual voir dire of each veniremember. In addition, the veniremembers completed a lengthy written questionnaire that included questions regarding the prospective juror’s background and criminal history.
Accordingly, because Phillips “had no absolute right to this information, and this information could have been learned from the veniremembers directly,” we find no error in the circuit court’s denial of this motion. Arthur, 711 So.2d at 1080.
V.
Phillips argues that the circuit court erred by not removing for cause venire-members T.J. and J.W.S., who, he claims, were biased.[18] Both T.J. and J.W.S. ultimately served on the jury that convicted Phillips. The gist of his argument is that as a result of the media coverage of the trial of his codefendant, Oscar Roy Doster, jurors T.J. and J.S. were under the mistaken impression that Phillips was involved with another murder that was purportedly committed by Doster after Doster escaped from jail a second time in 2005.[19]
The record indicates that during the circuit court’s general qualification of the ve-nire, the court asked whether anyone had a fixed opinion of Phillips that would bias his or her verdict. Neither T.J. or J.W.S. responded to that question.
Each veniremember completed a written questionnaire. The questionnaire included several questions designed to elicit the extent of the veniremembers’ exposure to pretrial publicity. Respective counsel were given an opportunity to review the completed questionnaires prior to voir dire.
After the prosecution and the defense completed voir dire of the venire as a group, individual voir dire was conducted. Part of the stated purpose of the individual voir dire was to enable respective counsel and the court to more thoroughly probe the veniremembers’ answers in the questionnaires regarding pretrial publicity.
During the individual voir dire of prospective juror T.J., the following occurred:
“THE COURT: Do you recall hearing any news accounts or reading about this case in the newspaper of anything like that?
“PROSPECTIVE JUROR: The information that — that I have about this was — my main concern was actually with the sheriffs department. But I do know *1004 there was an escape of several people. I heard about the Gantt situation, Texas, Louisiana in depth information. No.
“[DEFENSE COUNSEL]: Do you recall Mr. Phillips’s name in particular?
“PROSPECTIVE JUROR: No, I didn’t. I didn’t know who he was until I came into court. The only one that I really recognized was the name of Dost-er.
“THE COURT: Regardless of what you heard or do remember right now or might recall during the course of this trial, we need to know whether or not you’d be able to disregard news accounts and things you heard on the street or whatever? Can you disregard all that and decide this case—
“PROSPECTIVE JUROR: Absolutely. Because ....
“THE COURT: Wait a minute — and just decide this case based on the evidence that comes to you during this trial?
“PROSPECTIVE JUROR: Absolutely.
“THE COURT: Okay.
“PROSPECTIVE JUROR: Yes.
“THE COURT: All right. Mr. [Defense Counsel].
“[DEFENSE COUNSEL]: ... You mentioned in your questionnaire that you heard about three people escaped, one man killed in Gantt robbery and in Texas.
“PROSPECTIVE JUROR: Yes.
“[DEFENSE COUNSEL]: That’s what you remember. Do you remember where you got that information?
“PROSPECTIVE JUROR: Star-News or the Mobile Press Register, one of the two.
“[DEFENSE COUNSEL]: Do you remember when that occurred or when you got that information?
“PROSPECTIVE JUROR: No, just back during the time it happened.
“[DEFENSE COUNSEL]: About four, four and a half years ago, and you recall that clearly at this point; is that correct?
“PROSPECTIVE JUROR: Clearly? Detailed? No. I just remember the situation taking place.
“[DEFENSE COUNSEL]: Okay. Now you make that same — almost the same statement in another question, ‘Three men escaped, killed one man in Gantt in robbery.’
“PROSPECTIVE JUROR: That was my recollection. That’s what I put down....
[[Image here]]
“[DEFENSE COUNSEL]: Do you recall Mr. Phillips’s name?
“PROSPECTIVE JUROR: No, I really don’t. Doster is the only one that I could remember. Didn’t even know this case was going to be when I came up here.
“[DEFENSE COUNSEL]: Do you recall any of the specifics involved with these issues at all as they were reported?
“PROSPECTIVE JUROR: The only thing I really remember about there was supposedly a murder taken place at a trailer in Gantt and then there was a comical situation to me of a city water truck being stolen.
“[DEFENSE COUNSEL]: If you find everything that you’ve heard or recall having heard, if you find all that to be true and testimony in this case, would you automatically vote for the death penalty?
“PROSPECTIVE JUROR: No.
“THE COURT: All right. Thank you, sir.
“[DEFENSE COUNSEL]: Your Honor, I’ve got one other question if I may. You said that your concern is with *1005 the sheriffs department with this. Can you explain that to me, sir?
PROSPECTIVE JUROR: I felt that the sheriffs department has been operating too lax. There should have been better things in place to never have allowed the escapes to have taken place. I’m not a fan of the sheriff, okay.
“[DEFENSE COUNSEL]: Thank you, sir.
“[PROSECUTOR]: [With] that statement in mind, first of all, you’re not impressed with the sheriff, but you don’t hold that against the State of Alabama or—
“PROSPECTIVE JUROR: The State of Alabama nor the sheriffs department. I have respect for a lot of people that’s in the sheriffs department. I really don’t know them, but I see their conduct, their actions when I meet and pass, etc. No, I have no agenda against the sheriffs department. It’s an individual there.
“[PROSECUTOR]: So in other words, you would be able to be a fair and impartial juror and put—
“PROSPECTIVE JUROR: Sure. Really don’t want on the case. I can say that up front. I have two businesses and really don’t need to be here, so I mean you make the decision.
“THE COURT: Thank you, Mr. [J]. Appreciate it.
[[Image here]]
“THE COURT: What says the State?
“[PROSECUTOR]: Satisfied.
“THE COURT: Defense?
“[DEFENSE COUNSEL]: Satisfied.
“THE COURT: He’s on [the veni-re]....”
(R. 1346-51.)
With regard to veniremember J.W.S., the following occurred during individual voir dire:
“THE COURT: Do you recall hearing any news reports about this?
“PROSPECTIVE JUROR: Oh, I’ve read all the publications beforehand, you know, through Montgomery-Advertiser, Dothan Eagle, and [television].
“THE COURT: Do you remember particular things you read or just kind of generally reading about it or both?
“PROSPECTIVE JUROR: Well, I remember reading of the escape and those type things from the standpoint of newspapers and TV.
“THE COURT: Before you got up here, did you remember Mr. Phillips’s name?
“PROSPECTIVE JUROR: Yes.
“THE COURT: If you were selected to serve as a juror on this case, would you be able to disregard any news reports or gossip or whatever you want to call it and decide this case only on the evidence presented in this trial?
“PROSPECTIVE JUROR: Yes, sir. No problem.
“THE COURT: Be able to completely remove yourself from anything you might have heard?
“PROSPECTIVE JUROR: I’ve always felt the evidence is what convicts a person or does not convict a person and no matter how much talk might have been said because I don’t know the details about it.
“THE COURT: Right.
“PROSPECTIVE JUROR: I just know what had been publicized publicly.
“THE COURT: Sure. And you’re telling me you’d be able to act as though you didn’t hear anything of that and hear this case just on the evidence?
“PROSPECTIVE JUROR: Yes, sir, I feel I could.
“THE COURT: Okay. Mr. [Defense Counsel],
*1006 “[DEFENSE COUNSEL]: ... You sound like you pay a great deal of attention to the news.
“PROSPECTIVE JUROR: I read-yes, sir, I do.
“[DEFENSE COUNSEL]: You’ve get [sic] the Montgomery-Advertiser five days a week and Dothan Eagle five days a week.
“PROSPECTIVE JUROR: Right.
“[DEFENSE COUNSEL]: Didn’t list [in the juror questionnaire] Andalusia-Star.
“PROSPECTIVE JUROR: Periodically I do. I don’t take the Andalusia-Star.
“[DEFENSE COUNSEL]: Do you listen to WSFA and other Dothan station?
“PROSPECTIVE JUROR: TV wise?
“[DEFENSE COUNSEL]: Yes, sir.
“PROSPECTIVE JUROR: I saw it on both of them in regard to what we’re talking about here, you know.
“[DEFENSE COUNSEL]: Were those that you heard, were they recent?
“PROSPECTIVE JUROR: No, sir.
“[DEFENSE COUNSEL]: Going back a long way.
“PROSPECTIVE JUROR: Going back a long way.
“[DEFENSE COUNSEL]: But when we came here you were familiar with Mr. Doster’s name and Mr. Phillips’s?
“PROSPECTIVE JUROR: Right.
[[Image here]]
“[DEFENSE COUNSEL]: You also stated that you watched the Eddie Knight show?
“PROSPECTIVE JUROR: Once or twice. Eddie is not one of my watching — watchers on a continuous basis.
“[DEFENSE COUNSEL]: I think what you said here was, ‘Just enough to say I had seen it.’
“PROSPECTIVE JUROR: That’s right. Just enough to say I had seen it.
“[DEFENSE COUNSEL]: And you mention in one question: Tell us what you know or have heard of the escape from Covington County jail? And you say, T have read most of the published news and heard the TV news from Do-than and Montgomery.
“PROSPECTIVE JUROR: That’s right.
“DEFENSE COUNSEL: It was well publicized.
“PROSPECTIVE JUROR: It was well publicized.
“[DEFENSE COUNSEL]: Then when we asked about the trailer-park shooting and such you mentioned, yes, you had heard about it and mentioned Mr. Phillips’s name. And then say what do you know? You say, ‘Only what has been publicized.’
“PROSPECTIVE JUROR: That’s right.
“[DEFENSE COUNSEL]: And public knowledge?
“PROSPECTIVE JUROR: That’s right. What I’ve read and heard.”
(R. 1572-76.)
After the individual voir dir of venire-member J.W.S. concluded, the following transpired:
“THE COURT: Any objections?
“[PROSECUTOR]: No, no objection.
“THE COURT: Any objection?
“[DEFENSE COUNSEL]: We’ll make the motion for cause because of his answers on the two items: One is we believe that he is going to support the death penalty from his answers. Second, is his knowledge level of this case matter. He knows everything on this that’s been read and published.
*1007 “THE COURT: He knows what’s been published, right.
“[DEFENSE COUNSEL]: Yes, sir. So we would object to him and ask for a for-cause strike.
“THE COURT: Response?
“[PROSECUTOR]: Judge, we don’t agree and we think the juror is qualified.
“THE COURT: Challenge is denied. He’ll be on [the venire]. He was pretty-clear that he could go either way and that he could disregard.”
(R. 1579.)
As evidenced from the first excerpt from the record, above, Phillips did not argue at trial that the circuit court should have removed for cause prospective juror T.J. from the venire; in fact, defense counsel indicated that counsel was satisfied with T.J. remaining on the venire. Thus, with regard to prospective juror T.J., we will review his claim for plain error only. Rule 45A, Ala.R.App.P.
“ ‘ “[A]s the Alabama Supreme Court stated in Ex parte Grayson, 479 So.2d 76 (Ala.) cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985):
“ ““ “To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror’s impartiality would be to establish an impossible standard. It is sufficient if a juror can lay aside his impressions or opinions and render a verdict based on the evidence presented in court....”
“ ‘ “ ‘The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved. Murphy v. Florida, 421 U.S. 794, 799-800, 95 S.Ct. 2031, 2035-2036, 44 L.Ed.2d 589 (1975). Thus, “the proper manner for ascertaining whether adverse publicity may have biased prospective jurors is through the voir dire examination.” Anderson v. State, 362 So.2d 1296, 1299 (Ala.Crim.App.1978).’
“‘“479 So.2d at 80. ““The relevant question is not whether the community remembered the case, but whether the jurors at [the accused’s] trial had such fixed opinions that they could not judge impartially the guilt of the defendant.’ Patton v. Yount, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984).’” Siebert v. State, 562 So.2d 586, 589 (Ala.Cr. App.1989) aff'd, 562 So.2d 600 (Ala.), cert. denied, 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 408 (1990), quoting Fortenberry v. State, 545 So.2d 129 (Ala.Cr.App.1988), aff'd, 545 So.2d 145 (Ala.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990).”
‘“Whitehead v. State, 777 So.2d 781, 801-02 (Ala.Crim.App.1999), aff'd, 777 So.2d 854, (Ala.2000).’
“Gavin v. State, 891 So.2d 907, 940 (Ala. Crim.App.2003), cert. denied, 891 So.2d 998 (Ala.2004).
“In Alabama, the standard for striking a potential juror for cause because of the juror’s bias requires that the juror have a fixed opinion concerning the defendant’s guilt that would interfere with his ability to render a fair and unbiased verdict.
“ ‘Section 12-16-150(7), Ala.Code 1975, states that a juror is subject to being struck for cause if “he has a fixed opinion as to the guilt or innocence of the defendant which would bias his verdict.”
“ ‘ “To justify a challenge for cause, there must be a proper statutory ground or ‘ “some matter which imports absolute bias or favor, and *1008 leaves nothing to the discretion of the trial court.” ’ Clark v. State, 621 So.2d 309, 321 (Ala.Cr.App.1992) (quoting Nettles v. State, 435 So.2d 146, 149 (Ala.Cr.App.1983)). This court has held that ‘once a juror indicates initially that he or she is biased or prejudiced or has deep-seated impressions’ about a case, the juror should be removed for cause. Knop v. McCain, 561 So.2d 229, 234 (Ala.1989). The test to be applied in determining whether a juror should be removed for cause is whether the juror can eliminate the influence of his previous feelings and render a verdict according to the evidence and the law Ex parte Taylor, 666 So.2d 73, 82 (Ala. 1995) A juror ‘need not be excused merely because [the juror] knows something of the case to be tried or because [the juror] has formed some opinions regarding it.’ Kinder v. State, 515 So.2d 55, 61 (Ala.Cr. App.1986).” ’
“Pace v. State, 904 So.2d 331, 340 (Ala. Crim.App.2003), quoting Ex Parte Davis, 718 So.2d 1166, 1171-72 (Ala. 1998).”
Yancey v. State, 65 So.3d 452, 464-65 (Ala. Crim.App.2009).
“ ‘The trial judge is given much discretion in determining whether a potential juror should be struck for cause. According to Rule 18.4(e), Ala. R.Crim. P.:
“ ‘ “When a prospective juror is subject to challenge for cause or it reasonably appears that the prospective juror cannot or will not render a fair and impartial verdict, the court, on its own initiative or on motion of any party, shall excuse that juror from service in the case.”
[[Image here]]
“ ‘Furthermore, in order to determine whether the trial judge’s exercise of discretion was proper, this Court will look to the questions directed to and answers given by the prospective juror on voir dire. Ex parte Cochran, 500 So.2d 1179 (Ala.1985).’
“Holliday v. State, 751 So.2d 533, 535 (Ala.Crim.App.1999). Also, “[t]he trial judge is in the best position to hear a prospective juror and to observe his or her demeanor.’” McNair v. State, 653 So.2d 320, 324 (Ala.Crim.App.1992), aff'd, 653 So.2d 353 (Ala.1994) (quoting Ex parte Dinkins, 567 So.2d 1313, 1314 (Ala.1990)) Finally,
“ ‘[t]he test for determining whether a strike rises to the level of a challenge for cause is “whether a juror can set aside their opinions and try the ease fairly and impartially, according to the law and the evidence.” Marshall v. State, 598 So.2d 14, 16 (Ala.Cr.App. 1991). “Broad discretion is vested with the trial court in determining whether or not to sustain challenges for cause.” Ex parte Nettles, 435 So.2d 151, 153 (Ala.1983). “The decision of the trial court ‘on such questions is entitled to great weight and will not be interfered with unless clearly erroneous, equivalent to an abuse of discretion.’ ” Nettles, 435 So.2d at 153.’
“Dunning v. State, 659 So.2d 995, 997 (Ala.Crim.App.1994).”
Killingsworth v. State, 33 So.3d 632, 637-38 (Ala.Crim.App.2009).
This Court has reviewed the entire voir dire, as well as the completed questionnaires, and we find no error in the circuit court’s not excusing for cause veniremember T.J., nor do we find any error in the circuit court’s denial of Phillips’s challenge for cause as to venire-member J.W.S. Although each of these *1009 prospective jurors indicated that they had been exposed to pretrial publicity about the case — and T.J. may have had some incorrect impressions from that media coverage — there is no indication that they could not render a fair and impartial verdict based solely upon the evidence presented at trial.
Accordingly, no basis for reversal exists regarding this claim.
VI.
Phillips contends that the circuit court erred in denying his motion for a change of venue because, he argues, the community was so “saturated with prejudicial pretrial publicity” that he was unable to receive a fair trial by an unbiased jury.[20]
The record reflects that Phillips filed a motion for a change of venue that included numerous newspaper articles and media reports about the crimes. This motion was later amended to include additional newspaper articles and media reports that were generated about the trial of his accomplice, Doster, which was conducted a few months before Phillips’s trial. The circuit court reserved ruling on the motion pending the completion of the voir dire of the venire at trial.
As discussed in Part V of this opinion, each veniremember completed a written questionnaire, which included several questions designed to elicit the extent of the veniremembers exposure to pretrial publicity. The respective counsel were given an opportunity to review the completed questionnaires prior to voir dire.
The qualification and voir dire of the prospective jurors took approximately 3 days, and encompasses 768 pages of the record on appeal. (R. 910-1673.) During the qualifying process, in addition to the voir dire of the venire as a group, the respective counsel questioned each remaining veniremember individually, in part, to probe the veniremember’s answers in the questionnaire regarding pretrial publicity and its effect on the veniremember.
Once the entire voir dire process was complete, defense counsel renewed the motion for a change of venue, and the court considered additional arguments regarding the motion from respective counsel. The circuit court ultimately denied the motion for a change of venue, indicating that its ruling was based not only upon the venire-member’s responses to the various questions propounded by the respective counsel and the court, but also upon the venire-members’ demeanor during the voir dire process.
“The standard we use when evaluating whether a trial court has erred in denying a motion for a change of venue was addressed by the Alabama Supreme Court in Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985). The Court stated:
“ ‘Absent a showing of abuse of discretion, a trial court’s ruling on a motion for change of venue will not be overturned. Ex parte Mag-wood, 426 So.2d 929, 931 (Ala.), cert. denied, 462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1355 (1983). In order to grant a motion for change of venue, the defendant must prove that there existed actual prejudice against the defendant or that the community was saturated with prejudicial publicity. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Franklin v. State, 424 So.2d 1353 (Ala.Crim. App.1982). Newspaper articles or widespread publicity, without more, are insufficient to grant a motion for change of venue. Anderson v. State, 362 So.2d 1296, 1298 (Ala.Crim.App. *1010 1978). As the Supreme Court explained in Irvin v. Dowd, 366 U.S. 717, 728, 81 S.Ct. 1639, 1642-43, 6 L.Ed.2d 751 (1961):
“1 “To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, •without more, is sufficient to rebut the presumption of a prospective juror’s impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.... ”
“ ‘The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved. Murphy v. Florida, 421 U.S. 794, 799-800, 95 S.Ct. 2031, 2035-2036, 44 L.Ed.2d 589 (1975). Thus, “[tjhe proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.” Anderson v. State, 362 So.2d 1296, 1299 (Ala.Crim.App. 1978).’
“ ‘ “The mere fact that publicity and media attention were widespread is not sufficient to warrant a change of venue. Rather, Ex parte Grayson[, 479 So.2d 76 (Ala.1985),] held that the appellant must show that he suffered actual prejudice or that the community was saturated with prejudicial publicity.” Slagle v. State, 606 So.2d 193, 195 (Ala.Cr.App. 1992).’ Wilson v. State, 111 So.2d 856, 924 (Ala.Crim.App.1999), aff'd, 111 So.2d 935 (Ala.2000), cert. denied, 531 U.S. 1097, 121 S.Ct. 826, 148 L.Ed.2d 709 (2001). Moreover, we must consider the length of time between the alleged pretrial publicity and the trial. Wilson. ‘When requesting a change of venue, “the burden of proof is on the defendant to ‘show to the reasonable satisfaction of the court that a fair and impartial trial and an unbiased verdict cannot be reasonably expected in the county in which the defendant is to be tried.” ’ Jackson v. State, 791 So.2d 979, 995 (Ala.Crim. App.2000), cert. denied, 791 So.2d 1043 (Ala.2000), quoting Hardy v. State, 804 So.2d 247, 293 (Ala. Crim.App.1999). Whether to grant a motion for a change of venue is addressed to the sound discretion of the trial court. Acklin v. State, 790 So.2d 975 (Ala.Crim.App. 2000), cert. denied, 790 So.2d 1012 (Ala. 2001), cert. denied, 533 U.S. 936, 121 S.Ct. 2565, 150 L.Ed.2d 729 (2001). The trial court is in a better position than is an appellate court to rule on such a motion. The trial court was present in the community at the time of the alleged pretrial publicity and knows the specifics of the history of the case in the community. We will not reverse a trial court’s ruling on a motion for a change of venue unless a clear abuse of discretion is shown. Addin.
“Here, the record contains numerous articles about the two robbery/murders. However, most of the articles are factual accounts of the circumstances surrounding each case and the investigation of each case. No evidence indicated that the community was saturated with prejudicial pretrial publicity about the two cases. The fact that the community was not so saturated is shown by the voir dire examination. During voir dire the trial court asked the prospective jurors if they had any knowledge about the case. (R. 1182.) Eight jurors indicated that they had heard about the case from radio, newspaper, or television reports. Each of these jurors was taken to the bench and questioned about his or her knowledge of the case. Two jurors indicated that they could not render a fair and impartial verdict. These jurors were excused for cause. The other six jurors who had heard about the case indicated that they could be fair and *1011 impartial. A number of them indicated that the publicity about the case had been so long ago that they did not remember any pertinent facts about the case. (R. 1182-1222.) The voir dire supports the trial court’s denial of the motion for a change of venue. There is absolutely no evidence that the trial court abused its discretion in denying this motion.”
Stallworth v. State, 868 So.2d 1128, 1141— 43 (Ala.Crim.App.2001). See also Ex parte Travis, 776 So.2d 874 (Ala.2000); Gobble v. State, [Ms. CR-05-0225, Feb. 5, 2010] — So.3d-(Ala.Crim.App.2010).
This Court has reviewed the articles and various media reports introduced into the record in support of the motion for a change of venue, and we conclude that “most of the articles are factual accounts of the circumstances surrounding each case and the investigation of each case.” Stallworth, 868 So.2d at 1142-43. Although there appeared to be a significant amount of media coverage surrounding Phillips’s and Doster’s escape, crime spree, capture, and Doster’s trial, the evidence does not establish that the publicity so saturated the community as to render a fair trial virtually impossible. This is shown by the answers the veniremembers gave during the voir dire.
The record indicates that many venire-members did have some familiarity with the case; however, only three venire-members indicated that they had a fixed opinion regarding the case. Those venire-members did not serve on the jury that convicted Phillips.
Likewise, Phillips did not establish that he suffered any actual prejudice as a result of the pretrial publicity. The 12 persons who served on the jury that convicted Phillips each indicated that even if he or she had some pretrial knowledge regarding the case, the juror would base his or her verdict only on the evidence presented at trial.[21]
Accordingly, there is no indication from the record that the circuit court abused its discretion in denying Phillips’s motion for a change of venue.[22]
VII.
Phillips maintains that the circuit court erred in denying his motion to suppress the statement he gave to Covington County Sheriffs investigators on November 19, 2002.[23] Specifically, Phillips contends that the statement was coerced by the condi *1012 tions of his confinement, and that his statement occurred without the assistance of counsel, even though he had invoked his right to counsel earlier that day.
The record indicates that Phillips made four statements to law-enforcement officials in which he confessed his involvement in the crimes that he and Doster committed in the two-week period that they were at-large: three statements were made to Texas Ranger Brooks Long after Phillips was booked into the Crockett County Jail on November 18, 2002, and a fourth statement was made to Covington County investigators on November 19, 2002, while Phillips was still incarcerated at the Crockett County jail.
Phillips moved to suppress all the statements he made to Long, as well as the statement that he gave to the Covington County investigators. In his written motions, Phillips argued that his statements were due to be suppressed because, he claimed, the statements were coerced by the purportedly miserable conditions of his confinement. Phillips also alleged that he was arrested without probable cause, that he was not adequately apprised of his rights by the Texas officials, that his statements were not voluntarily rendered because he was mentally unstable, and that his statement to the Alabama officials was obtained without the benefit of counsel even though, he claimed, he had invoked his right to counsel to a Texas justice of the peace earlier that day.
Phillips elaborated upon his claims in an affidavit filed in support of his motions to suppress, which reads, in relevant part:
“I was arrested by State authorities about noon and placed in custody. Earlier that day, we drank a 12 pack of beer and were on heroine. The needles were placed in the crushed beer cans. The Texas officials took all my clothes, socks, shoes, underwear and everything and gave me a plastic short sleeve bag, without closures to wear. It looked similar to a hospital gown but made of thick plastic. The garment had no heat value, in fact it was cold to the touch.
“I was placed in a concrete cell, no mattress only concrete floor, steel bed, toilet and shower. The heat was off and the cell was freezing. I felt it was about 40 degrees in there. I was separated from the other inmates. The cell was an ice box with no place to get warm. The freezing surfaces in the unheated cell, with only a plastic gown to wear, and my bare feet on the cold concrete floor caused my teeth to chatter and my body to shake, it was unbearable.
“A jailer would check on me every 15 minutes and fill out a log on the outside of the bars. I asked for a blanket and told him I was freezing. He said I couldn’t have them. I wrapped toilet paper around my legs and feet like a mummy to try and get warm but it didn’t help. They kept me isolated.
“I met with a pastor after I was booked in and before my clothes were taken away. The pastor gave me two different Bibles. The pastor told me the only way you can be forgiven by God was to confess to the legal authorities.
“He said read it for yourself and showed me James 5: verses 15 and 16 ‘.... and if he has committed sins, he will be forgiven. 17 confess your trespasses (Nu-text reads ... Therefore confess your sins) to one another and pray for one another that you may be healed.’ I did not tell him what happened.
“I stayed in the ‘ice box’ until Officer Long came and asked me if I wanted to talk. I met with Officer Long. He offered me hot coffee and a cigarette. I had not eaten and the warm drink was a relief. I was willing to say anything to stay in the warm office, say anything to *1013 stay in the warm office, drinking hot coffee and smoking cigarettes even if it was for only 30 minutes to stay out of my cell, the ‘ice box.’
“After I talked with Mr. Long, I was taken back to the ‘ice box’ and an older man in his later 60’s, kind of heavy set, 5'7" tall with a gut, wearing black frame glasses said that he was a magistrate. He brought me extradition papers. He asked me if I wanted a lawyer and I said yes. They said are you going to fight extradition, I said no. I did say I wanted a lawyer and I filled out their form, asking for a lawyer. I never saw an attorney in Texas.
“They kept me naked in the ‘ice box’ until the Alabama detectives came. They said I was still on suicide watch. I was freezing. The deputy continued to check and write on a pad every 15 minutes. I think it was to make sure I wasn’t freezing to death.
“After I talked with the Alabama Officials, they gave me my clothes and placed me in general population in the heated portion of the jail.
“I would have remained silent but for the pastor, them taking my clothes, the cold cell, the cigarettes and warm room and hot coffee during the interview. I asked for an attorney and they never provided me one. The pastor was provided right away. I was willing to say anything, not to have to go back to the ‘ice box’ and for a warm room.”
(C.2031-32.)
On January 9, 2007, a lengthy suppression hearing was conducted. (R. 576-824.) The circuit court denied the motions to suppress by written order, which will be addressed in more detail below.
Toward the end of the trial, a second suppression hearing was conducted outside the presence of the jury in order to reexamine the admissibility of the statement that Phillips made to the Alabama authorities on November 19, 2002, in light of the additional testimony of Texas Justice of the Peace James Hearne, who was not present at the first suppression hearing. (R. 3158-86.) After hearing Hearne’s testimony, and arguments by respective counsel, the circuit court by implication again denied Phillips’s motion to suppress the statement that he gave to the Alabama authorities on November 19, 2002. The recorded statement given on November 19 was played for the jury at trial, and the transcript of the statement was introduced into evidence. The three statements Phillips made to Texas Ranger Brooks Long on November 18 were not admitted into evidence at trial because Ranger Long was not able to be present at trial because of a family emergency.
On appeal, Phillips reasserts his arguments that the statement that he gave Alabama authorities on November 19 should have been suppressed because, he says, it was coerced by the supposedly cold, miserable conditions of his confinement and because it was given -without the benefit of counsel even though he requested the assistance of counsel earlier that day.
In order to address Phillips’s assertions on appeal, an understanding of the events that transpired from the time of Phillips’s arrest until he made his statement to the Covington County investigators on November 19, 2002, is necessary. The following evidence was presented at the' suppression hearings:
As discussed in more detail in Part VIII of this opinion, on November 18, 2002, around 2:00, p.m., Texas Highway Patrol Officer Donald Van Zant stopped Phillips and Doster as they were traveling west on Interstate 10 in LeMaster’s truck. Phillips and Doster were ordered to get out of the truck, and they were arrested at the scene on fugitive warrants. Van Zant in *1014 formed Phillips of his Miranda[24] rights at the scene.
Van Zant said that Phillips did not appear to be under the influence of any substances, and he indicated that he understood his rights. Phillips and Doster were transported directly to the Crockett County, Texas, jail. Van Zant conducted an inventory of those items that were clearly visible in the truck, but he did not see any crushed beer cans or drugs in the truck.
Crockett County Sheriff Shannon Fen-ton testified that Phillips was booked into the Crockett County jail around 3:00 p.m. on November 18, 2002. During this process, Phillips’s clothing was removed, he was searched, and he was issued a standard white jumpsuit and two blankets. Phillips was then placed into a small holding facility beside the booking area so the jailer could communicate with him and could continue to complete the paperwork. Fenton testified that there was no indication that Phillips was under the influence of any substances at that time.
Around 3:15 p.m., Texas Ranger Long arrived at the Crockett County jail in order to assist the local law-enforcement officials with the investigation. When Ranger Long entered the jail, a man in the holding cell, who Ranger Long later learned was Phillips, saw his badge and inquired as to whether Long was a Texas Ranger. Long responded that he was, and then he and Phillips engaged in a conversation about the Texas Rangers while Ranger Long waited for the door to the dispatcher’s office to be opened. Phillips was wearing a jail jumpsuit at that time. According to Ranger Long, Phillips was “nervous, talkative, polite, [and] engaging,” but he did not appear to be under the influence of any substances.
Ranger Long entered the dispatcher’s office. The only information that Long had at that time was that the truck was stolen, and that Phillips and Doster had been arrested. Ranger Long told Sheriff Fenton that he needed to talk to Phillips to “find out what was going on.” According to Ranger Long, Sheriff Fenton escorted Phillips to the sheriffs office to talk with Ranger Long.
Ranger Long testified that although the Texas authorities were in communication with the Alabama authorities, at the time Phillips was brought to the sheriffs office, the Texas authorities did not know the extent of Phillips’s involvement in any crimes. Long said that the Texas authorities did not know whether Phillips was a hitchhiker or why he was in the truck — all they knew was that Phillips was in the truck when it was stopped.
Ranger Long stated that when Phillips was brought into the sheriffs office, he was wearing the jail jumpsuit. Phillips was nervous and talkative. Phillips asked for a cigarette, so Sheriff Fenton gave Phillips one of his cigarettes, and he was allowed to smoke. Phillips was also given a cup of coffee to drink.
Ranger Long asked Phillips something like, “Bobby, why are you here?” or “What’s the deal, Bobby?” Phillips volunteered, “Well, we broke into a guy’s house, killed him, shot him. Escaped from jail and did some burglaries, ended up in Texas and y’all caught us.”
At that point, Ranger Long apprised Phillips of his Miranda rights. The time was 3:37 p.m. on November 18. Ranger Long testified that Phillips appeared to understand his rights, and that he voluntarily waived those rights. According to Ranger Long, no threats or promises were made to Phillips in return for his state- *1015 raent, and Phillips did not appear to be under the influence of any substances.
Phillips then gave Ranger Long an abbreviated version of the crime spree, from his escape to how he and Doster ended up in Texas. While Ranger Long was engaged in this conversation with Phillips, Ranger Long learned from the authorities that no weapons were found in the truck and that the Alabama authorities did not have a murder weapon, so Ranger Long asked Phillips about the weapon. Phillips told Ranger Long that the weapon had been pawned in Baton Rouge, Louisiana. Ranger Long left the room and contacted the Andalusia, Alabama, Sheriffs Department and informed it of what Phillips had told him regarding the location of the weapon.
Ranger Long returned to Sheriff Fen-ton’s office with a microcassette recorder. Ranger Long reinformed Phillips of his rights, and then conducted a more detailed interview with Phillips, which was recorded. The taped interview began at 3:55 p.m. and ended at 4:24 p.m.
After the taped interview ended, Phillips requested to see a psychiatrist or a priest. Ranger Long left the room and informed the jailer to make arrangements for Phillips to talk with a minister. Ranger Long testified that he had no further contact with Phillips.
An official from the jail contacted Reverend John Fluth, the pastor of the nearby Ozona United Methodist Church, and asked him to speak to Phillips. Rev. Fluth went to the jail and talked with Phillips, who was in a jail cell “in a hallway.” Rev. Fluth testified that during their conversation, he informed Phillips that he was not a lawyer and that he did not want to discuss any of the details of the crimes. Rev. Fluth encouraged Phillips to discuss the criminal matters with a lawyer. Rev. Fluth emphatically stated that he never advised Phillips to “confess to the cops.” Rev. Fluth did not recall whether it was cold in the jail, but he stated that if it had been, he would have informed the authorities.
Around 4:30 p.m. on that same day, Phillips and Doster were placed in lock-down in separate cells in cell block A. Sheriff Fenton made the decision to place Phillips in cell block A, which is the maximum-security cell block, based upon an assessment of Phillips’s mental-health status, his criminal history, and risk of escape. Sheriff Fenton testified that the inmates are fed at 5:30 p.m. and that there was no indication that Phillips was not fed at that time.
According to the jail logs, which were introduced into evidence, Phillips and Doster were placed on suicide watch around 6:00 p.m., on November 18. Sheriff Fenton explained that when an inmate is placed on suicide watch, the inmates’s clothing and bedding are typically removed, and the inmate is usually clothed in a suicide gown, which is a long, sleeveless, kevlar-like vest held together at the sides by Velcro. A jailer is required to check on the inmate at frequent intervals and to note the status of the inmate on a jail log.
Sheriff Fenton testified that based upon the jail logs, Phillips was possibly on suicide watch until at least November 23. Sheriff Fenton said that it was possible that during that time a blanket and clothing could have been returned to Phillips.
A large portion of Sheriff Fenton’s testimony at the suppression hearing was directed to the conditions of Phillips’s confinement — whether Phillips was housed in a cell with no heat and dressed in only a suicide gown. Sheriff Fenton testified that the jail was built in the 1890s. All of the cell blocks were heated by one heating unit; the booking area of the jail was heated by another unit; and the offices by a third unit. Sheriff Fenton did not recall *1016 there being any heating problems in Phillips’s cell.
The jail logs, which were admittedly confusing and often indecipherable, contained a handwritten notation indicating that at 7:00 a.m. on the morning of November 18 — before Phillips and Doster were brought to the jail at 3:00 p.m. that afternoon — the door at the end of the cell block A corridor was opened. Sheriff Fenton did not know why this notation was made, but he speculated that it was to allow heat into the corridor or to allow air to circulate. It was apparently not unusual to open the door to the corridor in order to allow air to circulate.
Sheriff Fenton said that there was no indication from the jail logs that Phillips had any trouble sleeping or that he had any other problems as a result of the allegedly cold temperature. There was also no indication from the jail logs that Phillips had to wrap himself in toilet paper in order to keep warm.
As noted above, James Hearne, a justice of the peace in Crockett County, Texas, did not testify at the first suppression hearing; however, he did testify at the suppression hearing held during trial. Hearne testified that part of his duties included administering a magistrate warning of rights to persons who have been arrested and brought to the Crockett County jail. Hearne explained that in the vast majority of cases, he went to the jail to perform the administration of the rights, as opposed to an individual’s being brought to his office.
Hearne testified that when he administered the rights, he usually stood inside the dispatcher’s office, behind a heavy-screen door, while the arrested person remained outside of the dispatcher’s office, with a jailer or deputy present. If the execution of warnings is administered at any place other than at the dispatcher’s door in the jail, Hearne specifically noted that on the rights form.
This was the procedure that Hearne followed when he apprised Phillips of his rights on the morning of November 19. When Hearne arrived at the dispatcher’s office, the jailer went to get Phillips and escorted him to the appropriate place outside the dispatcher’s office. Hearne said that Phillips was dressed in orange jail coveralls when he administered the rights to him.
Hearne identified the warning of rights form that he read to Phillips, which was introduced into evidence at the suppression hearing. The warning-of-rights form indicates that the place of the warnings was the Crockett County Jail, and the time was 9:30 a.m. on November 19, 2002.
When Hearne was provided the rights form by the jailer, the name “Michael Dwayne Phillips”[25] was already typed on the top of the form. As Hearne read the name on the form to Phillips, Phillips informed him that his real name was “Bobby O’Lee Phillips.” Hearne then read Phillips his rights. Hearne ensured that Phillips understood each right before proceeding to the next one. Hearne testified that Phillips did not invoke his right to counsel.
A handwritten notation at the bottom of the form reads, “My real name is Bobby O’Lee Phillips.” Phillips signed his name underneath the notation.
The next day, on November 20, 2002, at 11:00 a.m., Hearne returned to the jail and repeated the entire procedure with Phillips because there had been a change in the charge against Phillips. On the second warning-of-rights form dated November 20, 2002, at 11:00, a.m., Phillips’s name was *1017 correctly listed at the top of that form. Phillips also signed the form. Hearne testified that Phillips again indicated that he understood each of his rights.
After Hearne reinformed Phillips of his rights on November 20, Hearne observed Jailer Pablo Talamantez write on the bottom of an application-for-appointment-of-counsel form the following notation: “Note: In front of JP Hearne on 11-20-02 at 11:00 a.m. Phillips stated that he did not want an attorney.” The notation was signed by Pablo Talamantez. Hearne clarified that in Crockett County when an arrested person requests counsel, the person must complete the application for appointment of counsel form, and an indigent form.
At the suppression hearings, the defense made much of the fact that State could not produce a request-for-counsel form with a similar notation from Hearne’s November 19th encounter with Phillips — inferring from the absence of such a notation on a request-for-counsel form that Phillips did indeed request counsel on November 19. When the prosecutor questioned Hearne as to why there was not a corresponding request-for-counsel form -with a similar notation for the November 19 warning-of-rights proceeding, Hearne responded that “[i]t never occurred to [him.]” However, Hearne testified that if Phillips had requested counsel on November 19, he would have required him to complete the entire form, and he would have appointed him counsel. Hearne stated that at no point did Phillips invoke his right to counsel.
Scott Conner, an investigator for the Covington County Sheriffs Department in November 2002, testified at the initial suppression hearing that when the Covington County Sheriffs department received information that Phillips and Doster had been captured, he and Covington County Sheriffs Investigator Walter Inabinett traveled to Ozona, Texas, to investigate.
They arrived on the afternoon of November 19, 2002. Before talking with Phillips, Conner and Inabinett examined and inventoried LeMaster’s truck. After completing the inventory of LeMaster’s truck, they went to the Crockett County jail. They were escorted to the sheriffs office, where the interview with Phillips took place.
Conner testified that at the time of the interview, Phillips was dressed in a white jail jumpsuit and that he did not appear to be unhealthy, starving, or unusually cold. Conner said that Phillips did not appear to be under the influence of any drugs or alcohol. According to Conner, Phillips’s speech was coherent and normal.
Conner testified that Walter Inabinett informed Phillips of his rights, using the Covington County advice-of-rights form, which was introduced into evidence at the suppression hearing. Conner stated that Phillips appeared to understand his rights and that he indicated that he was willing to waive his rights.
Conner testified that neither he nor Ina-binett made any threats to Phillips or offered any promises of reward in order to induce Phillips’s statement. In Conner’s opinion, Phillips’s statement was voluntarily rendered.
Phillips initialed and signed a form indicating that he was willing to waive his rights and to answer questions without a lawyer present. Conner testified that at no point did Phillips invoke his right to counsel, nor did Phillips tell them that he had supposedly invoked his right to counsel earlier that day while talking with Hearne. Conner testified that if had been told that Phillips had earlier invoked his right to counsel, he would not have conducted any interview without securing counsel for Phillips.
*1018 The interview began at 7:04 p.m. and ended at 7:59 p.m. Conner testified that when the interview began, the questions were directed to Phillips’s escape from the Covington County jail. Conner said that Phillips was very cooperative and forthcoming, and that he told them what happened from the time of his escape until the time he was captured.
Phillips testified on his behalf at the suppression hearing. He testified that as soon as he arrived at the jail, all his clothes were removed and he was required to put on white coveralls. Phillips said that he was then placed in a holding cell, where he remained for approximately 30 minutes.
Phillips claimed that after he was taken from the holding cell, he had to remove his coveralls and put on a suicide gown. He was then placed into a concrete cell furnished with only a metal table, a metal bed with no mattress, and a toilet. Phillips said that he talked with Ranger Long a couple of hours after he was arrested, and that he was wearing only the suicide gown when he spoke with Ranger Long.
Phillips claimed that he was given nothing to eat that night following his arrest. Phillips said that the cell was very cold and that he repeatedly asked the guards for blankets but was told that he could not have any because he was on suicide watch. Phillips testified that it was so cold that night that he was unable to sleep.
Phillips claimed that he was kept in the cold cell, clothed only in a suicide gown, for approximately three days and three nights. He testified that after talking to the Alabama authorities, he was immediately taken off suicide watch, provided a mattress and sheets, given his clothes, and allowed into the general inmate population at the jail.
With regard to his allegation that he invoked his right to counsel during the November 19 hearing with Hearne, Phillips testified that he not only requested counsel, but that he also completed a request-for-counsel form and submitted the form to Hearne during their first meeting. Phillips said that he never received a copy of that completed form.
During the cross-examination of Phillips, the prosecutor questioned Phillips regarding some of the statements in his affidavit that were inconsistent with his testimony at the hearing. Phillips said that his memory regarding the specific events that happened on the day of his arrest was very clear, despite his claim that he had ingested copious amounts of alcohol and heroin. Phillips conceded that the alcohol and drugs that he claimed to have consumed did not affect his ability to understand his constitutional rights.
When questioned by the prosecutor about the inconsistencies between his affidavit and his suppression testimony, Phillips admitted that the events in his affidavit might not be in the correct chronological order; however, Phillips remained firm in his contention that he was dressed in the suicide gown in a cold cell when the extended conversation with Ranger Long took place. He claimed that Ranger Long came to his jail cell and said to him, ‘We got the Alabama Killers ... and Mr. Doster is the killer.” Phillips claimed that he responded to Ranger Long that Doster was not the killer and that is how the conversation was instigated.
On February 22, 2007, the circuit court denied Phillips’s motions to suppress his statements by the following order:
“The defendant has filed two separate pleadings seeking to suppress various statement made to the police. A hearing on said motions was held on January 9, 2007, and this court heard arguments and testimony pertaining to the defen *1019 dant’s motions to suppress. Based on the foregoing, the Court finds as follows:
“1. The defendant was properly advised of his Miranda rights at the time he was taken into custody on the side of the interstate in Crockett County, Texas. Testimony from Texas State Trooper Donald Van Zant established that there was probable cause for the defendant’s detention and arrest.
“2. At the time of his arrest, he was not under the influence of any intoxicant to the extent that it rendered him unable to understand his constitutional rights.
“3. The defendant was transported to the sheriffs department and was booked. He was dressed in standard prison coveralls.
“4. Shortly thereafter, the defendant initiated contact with Texas Ranger Brooks Long upon that officer’s arrival. At that time, the defendant, without prompting from any law enforcement officer, clearly indicated a desire to speak with Ranger Long.
“5. Upon being taken into the Sheriffs private office, the defendant voluntarily made a statement to the police. Prior to and during this oral unrecorded statement, the defendant was subject to no interrogation by law enforcement.
“6. Before interrogating the defendant, Ranger Long properly advised the defendant of his Miranda rights and obtained a knowing, voluntary, and intelligent waiver of those rights before obtaining a recorded statement from the defendant.
“7. The defendant did not see a reverend of any sort until after his interview with Ranger Long. During the meeting with the minister, no statements were made to the defendant that he could only seek forgiveness from God if he confessed to police.
“8. The defendant was taken before a magistrate within 48 hours of his arrest. In light of the documentary evidence at trial [the suppression hearing]; the numerous disturbing conflicts in the defendant’s affidavit and testimony; and the defendant’s consistent willingness to speak with law enforcement officers, the Court is not swayed by the defendant’s assertions that he requested counsel when brought before the magistrate.
“9. Prior to being interviewed by Covington County Sheriffs Investigators Scott Conner and Walter Inabinett a little over 29 hours after his initial arrest, the defendant was properly advised of his Miranda rights and voluntarily, knowingly, and intelligently waived those rights.
“10. The Court finds no credible evidence that at any time the defendant was interviewed, he did so out of desperation to seek warmth or comfort or food. There is some evidence that the defendant may have been on a suicide watch and dressed in a suicide gown and that the heat in the jail may not have been in the best working condition. Regardless, this Court finds from the testimony of Sheriff Shannon Fenton that the defendant was not imprisoned under the inhumane and torturous conditions of which the defendant describes. Further, there is no credible evidence that the defendant’s prison conditions impacted his ability to form an intelligent decision about whether to invoke any of his Miranda rights, especially in light of the testimony of Sheriff Fenton, Ranger Long, and Investigator Conner. Likewise, the aforementioned testimony indicates that there was no impairment in the defendant’s cognitive abilities either.
“Accordingly, it is hereby ordered, adjudged, and decreed that the defendant’s *1020 motions to suppress are overruled and denied.”
(C. 2143-45.)
A. Request-for-Counsel Claim
As noted, Phillips’s argument on appeal is twofold. First, he claims that his statement to the Alabama investigators was made after his request for counsel was ignored. In Eggers v. State, 914 So.2d 888 (Ala.Crim.App.2004), cert. quashed (Ala. 2005), cert. denied, 546 U.S. 1140, 126 S.Ct. 1143, 163 L.Ed.2d 1004 (2006), this Court addressed an assertion by Eggers that his statements were involuntary because he requested a lawyer before his statements on two occasions, but those requests were denied. We held:
“In Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the United States Supreme Court held:
“ ‘[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.... [A]n accused, ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.’
“451 U.S. at 484-85, 101 S.Ct. 1880 (footnote omitted). The purpose of this rule is to protect an accused in police custody from ‘ “badger[ing]” or “overreaching”— explicit or subtle, deliberate or unintentional — [that] might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel’s assistance.’ Smith v. Illinois, 469 U.S. 91, 98, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984), quoting Oregon v. Bradshaw, 462 U.S. 1039, 1044, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983).
“ ‘This “rigid” prophylactic rule, Fare v. Michael C„ 442 U.S. 707, 719 (1979), embodies two distinct inquiries. First, courts must determine whether the accused actually invoked his right to counsel. See, e.g., Edwards v. Arizona, supra, 451 U.S. [477], at 484-485 [(1981)] (whether accused “expressed his desire” for, or “clearly asserted” his right to, the assistance of counsel); Miranda v. Arizona, 384 U.S. [436], at 444-445 [ (1966) ] (whether accused “indicate[d] in any manner and at any stage of the process that he wish[ed] to consult with an attorney before speaking”). Second, if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked. Edwards v. Arizona, supra, [451 U.S.,] at 485, 486, n. 9.’
“Smith v. Illinois, 469 U.S. at 95, 105 S.Ct. 490.
“At the suppression hearing, Eggers testified that he requested a lawyer immediately upon his arrest in the tent city and again in the patrol car while being transported to the Osceola County Sheriffs Department. Agent Maldonado’s testimony directly refuted Eg-gers’s claim that he requested a lawyer immediately upon his arrest; Agent Maldonado specifically testified that Eg-gers never requested a lawyer when he was arrested at the tent city. Resolving this conflicting evidence in favor of the trial court’s ruling, as we must, we conclude that Eggers did not request a lawyer when he was arrested.”
*1021 Eggers, 914 So.2d at 899-900 (emphasis added).
As in Eggers, Phillips’s claim that he requested a lawyer during his first encounter with Justice of the Peace Hearne on November 19 was directly refuted by Hearne’s testimony that Phillips never requested counsel. In addition, with the exception of Phillips’s testimony, all the remaining evidence supports the conclusion that Phillips did not invoke his right to counsel at any point before or during his discussion with the Alabama investigators.
“ ‘ “The question of whether a confession was voluntary is initially to be determined by the trial court.” ’ Minor v. State, 914 So.2d 372, 388 (Ala.Crim.App. 2004), quoting Jackson v. State, 562 So.2d 1373, 1381 (Ala.Crim.App.1990). ‘[A]ny conflicts in the testimony or credibility of witnesses during a suppression hearing is a matter for resolution by the trial court. Absent a gross abuse of discretion, a trial court’s resolution of [such] conflicts] should not be reversed on appeal.’ Sheely v. State, 629 So.2d 23, 29 (Ala.Crim.App.1993) (citations omitted). ‘[A] trial court’s ruling based upon conflicting evidence given at a suppression hearing is binding on this Court, ... and is not to be reversed absent a clear abuse of discretion.’ Jackson v. State, 589 So.2d 781, 784 (Ala.Crim.App.1991). When there is conflicting evidence of the circumstances surrounding an incriminating statement or a confession, it is the duty of the trial judge to determine its admissibility, and if the trial judge decides it is admissible his decision will not be disturbed on appeal “unless found to be manifestly contrary to the great weight of the evidence.” ’ Ex parte Matthews, 601 So.2d 52, 53 (Ala.1992), quoting Williams v. State, 456 So.2d 852, 855 (Ala.Crim.App. 1984). ‘ “In reviewing the correctness of the trial court’s ruling on a motion to suppress, this Court makes all the reasonable inferences and credibility choices supportive of the decision of the trial court.” ’ Kennedy v. State, 640 So.2d 22, 26 (Ala.Crim.App.1993), quoting Bradley v. State, 494 So.2d 750, 761 (Ala.Crim.App.1985), aff'd, 494 So.2d 772 (Ala.1986).”
Eggers, 914 So.2d at 899.
The circuit court heard the conflicting evidence in regard to Phillips’s claim that he invoked his right to counsel, and the court ruled against Phillips. We find no abuse of discretion in the circuit court’s ruling.
B. Coercive Conditions of Confinement
Phillips also contends that his confession was not voluntarily rendered because, he says, it was induced by the coercive conditions of his confinement, i.e., he confessed only in order to secure warmth, food and clothes.
“ ‘When reviewing a claim questioning the voluntariness of a statement we apply the standard articulated by the Alabama Supreme Court in McLeod v. State, 718 So.2d 727 (Ala.), on remand, 718 So.2d 731 (Ala.Crim.App.), cert. denied, 524 U.S. 929, 118 S.Ct. 2327, 141 L.Ed.2d 701 (1998). The McLeod court stated:
“ ‘ “For a confession, or an inculpa-tory statement, to be admissible, the State must prove by a preponderance of the evidence that it was voluntary. Ex parte Singleton, 465 So.2d 443, 445 (Ala.1985). The initial determination is made by the trial court. Singleton, 465 So.2d at 445. The trial court’s determination will not be disturbed unless it is contrary to the great weight of the evidence or is manifestly wrong. Marschke v. State, 450 So.2d 177 (Ala.Crim.App.1984)....
*1022 “‘“It has long been held that a confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency. Bram v. United States, 168 U.S. 532, 18 S.Ct. 188, 42 L.Ed. 568 (1897). In Culombe [v. Connecticut ], 367 U.S. 568, at 602, 81 S.Ct. 1860, 6 L.Ed.2d 1037 [ (1961) ], the Supreme Court of the United States explained that for a confession to be voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess. If his capacity has been impaired, that is, ‘if his will has been overborne’ by coercion or inducement, then the confession is involuntary and cannot be admitted into evidence. Id. (emphasis added in McLeod).
“ ‘ “The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the ‘totality of the circumstances.’ Boulden v. Holman, 394 U.S. 478, 480, 89 S.Ct. 1138, 22 L.Ed.2d 433, (1969); Greenwald v. Wisconsin, 390 U.S. 519, 521, 88 S.Ct. 1152, 20 L.Ed.2d 77, (1968); see Beecher v. Alabama, 389 U.S. 35, 38, 88 S.Ct. 189, 19 L.Ed.2d 35, (1967). Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant’s will was overborne by coercion or inducement. See Ex parte Matthews, 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstances), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872, (1992); Jackson v. State, 562 So.2d 1373, 1380 (Ala.Crim.App.1990) (stating that, to admit a confession, a court must determine that the defendant’s will was not overborne by pressures and circumstances swirling around him); Eakes v. State, 387 So.2d 855, 859 (Ala.Crim.App.1978) (stating that the true test to be employed is ‘whether the defendant’s will was overborne at the time he confessed’) (emphasis added in McLeod).” ’
“McGriff v. State, 908 So.2d 961, 983 (Ala.Crim.App.2000).”
Stallworth v. State, 868 So.2d 1128, 1148-49 (Ala.Crim.App.2001).
With the principles addressed in Stallworth and Eggers in mind, we have reviewed all the evidence on the motions to suppress. Although the evidence was conflicting regarding whether Phillips was confined in only a suicide gown in less than ideal circumstances, the circuit court found that there was no credible evidence indicating that Phillips’s will was overborne by the conditions of his confinement thereby rendering his confession involuntary. Based upon our review of the evidence, we conclude that the circuit court’s finding on the conflicting evidence is not contrary to the great weight of the evidence or manifestly wrong.
Accordingly, for the reasons set forth above, the circuit court’s denial of Phillips’s motion to suppress is affirmed.
VIII.
Phillips argues that the circuit court erroneously allowed into evidence a video of his roadside detention and arrest. Specifically, Phillips contends that his “presumption of innocence was destroyed when the jury viewed him being arrested, shackled, and placed in a patrol car.”[26]
During the State’s case, Bob Hartman, a deputy sheriff in Sutton County, Texas, testified that around 1:50 p.m. on November 18, 2002, while he was patrolling a rest *1023 area on the westbound side of Interstate 10, he noticed an “older model black pickup ... [with] Alabama plates on it” that, he said, “didn’t seem quite right.” Hartman testified that the paint on the truck was not original. Hartman requested a check on the license plate to determine whom the truck was registered to, and to find out if the truck had been reported stolen. Hartman testified that when he did not receive an immediate response from the dispatcher, he left that rest area and drove to the rest area on the eastbound side of the interstate. After patrolling the eastbound rest area, he drove east towards Señora, Texas.
Hartman had driven approximately three miles, when the dispatcher contacted him on the radio and told him to telephone her. When Hartman contacted the dispatcher on his cell phone, the dispatcher told Hartman that she had “gotten [a] return” on the license plate and that the “vehicle was stolen and the subjects in it [were wanted] out of the State of Alabama for various crimes.” Hartman said that the dispatcher gave him the model year of the pickup truck, and she told him the truck should be red in color with a camper-shell on it.
When Hartman received this information, he turned his vehicle around and drove back the rest area on the westbound side of Interstate 10, but the truck was no longer there. Hartman drove west on Interstate 10, hoping to catch the truck.
He radioed the dispatcher and asked her to see if a state trooper could intercept the truck. Hartman testified that when he saw the truck again, it was parked on the side of Interstate 10 in Crockett County. A state trooper had stopped the truck, and the occupants of the truck were “on the ground.”
The next witness to testify was Donald Van Zant, a corporal with the Texas Highway Patrol. Van Zant said that on November 18, 2002, around 2:00 p.m., he was traveling east toward Señora from Ozona, Texas, when he “heard a radio broadcast out of Sutton County that a vehicle had left a roadside area that was wanted.” (Vol.16, R. 3104-05.) The dispatcher broadcast a description of the truck, including the detail that the truck was maroon-colored with a camper-shell. Van Zant testified that Deputy Hartman contacted him directly and clarified that the truck did not have a camper-shell on it, and that the truck was actually black.
Around that same time, Van Zant saw the truck matching the description traveling toward him. He turned his car around and pulled in behind the truck. After reading the license plate and determining that the truck matched the description given by Hartman, Van Zant activated the emergency lights in his car. The driver steered the truck to the side of the road and stopped.
Van Zant testified that he got out of his automobile with his shotgun and approached the truck. The driver and passenger in the truck, who were later determined to be Phillips and Doster, respectively, raised their hands in the air. Van Zant instructed Phillips and Doster to get out of the vehicle one at a time.
When Phillips got out of the vehicle, Van Zant asked him whether they were wanted for any crimes. When Phillips replied that they were, Van Zant instructed Phillips and Doster to lie “belly down in the ditch.” Phillips and Doster complied. Van Zant testified that he radioed for backup, and that he patted down Phillips and Doster to determine if they had any weapons.
Texas Highway Patrol Officer Curt Knapp and other law-enforcement personnel arrived at the scene. Van Zant testified that when Knapp asked him if the two men were handcuffed he replied, “[N]o, *1024 but they think they are,” and he explained that they had not “moved a muscle.” Van Zant testified that Knapp and another law-enforcement officer handcuffed Phillips and Doster.
Van Zant said that while he was at the scene, he obtained general information from Phillips and Doster, and that he informed Phillips of his rights using a standard form. Van Zant testified that by that time Phillips was in a seated position.
Van Zant testified that the events were recorded by the video camera in his vehicle and that he had reviewed the video the night before his testimony. Van Zant said that the video was an accurate depiction of the events as they transpired that day and that there had been no additions or deletions to the video.
At that point in Van Zant’s testimony, the State moved to admit State’s Exhibit 234, a DVD copy of the video recording of the roadside detention and arrest. Phillips did not object to the admission of the video. The DVD copy was admitted into evidence and played for the jury.
Van Zant testified that the video contained no audio because he did not turn on the audio-recording when he got out of his vehicle. As the video played for the jury, Van Zant explained who and what was being depicted.
On appeal, Phillips asserts that “the jury’s prolonged exposure to Mr. Phillips’ shackling and arrest undermined the reliability of his conviction.” (Phillips’s brief, at 19.) He claims that “[bjecause jurors watched for nearly twenty minutes as officers treated Mr. Phillips with the type of caution reserved for a dangerous criminal, they were apt to presume Mr. Phillips had engaged in crime and their guilt phase determination was thus a foregone conclusion.” (Phillips’s brief, at 20.)
Because Phillips did not object to the admission of the video at trial, we must determine whether the admission of the video constituted plain error and, if so, whether such error “probably has adversely affected” Phillips’s “substantial right[s].” Rule 45A, Ala.R.App.P.
In the capital-murder case of Gobble v. State, [Ms. CR-05-0225, February 5, 2010] — So.3d -,-(Ala.Crim.App.2010), Gobble argued that her “‘presumption of innocence’ was destroyed when the jury was allowed to see her in shackles and an orange prison-issued jumpsuit during her third videotaped statement to police.” This Court disagreed, reasoning:
“In Barber v. State, 952 So.2d 393 (Ala.Crim.App.2005), we addressed whether it was reversible error to allow a videotape of the defendant’s statement to be shown to the jury when the videotape showed the defendant wearing handcuffs. In concluding that there must be a showing of ‘actual prejudice,’ we stated:
“ ‘[D]uring the third interview with Edger, the appellant is wearing handcuffs. In Gates v. Zant, 863 F.2d 1492, 1501-02 (11th Cir.1989), which the appellant cites, the United States Court of Appeals for the Eleventh Circuit addressed a similar situation as follows:
“ ‘ “Gates’ other challenge to the videotaped confession is that its admission was unduly prejudicial because it portrayed him in handcuffs. As we have noted previously, although the handcuffs are not always visible, it is evident throughout the fifteen-minute tape that the defendant is handcuffed. We are aware of no cases which address the propriety of handcuffing during a videotaped confession. Nonetheless, the resolution of the issue is apparent from earlier cases addressing handcuffing in and around trials.
*1025 “‘“The principal difficulty arising from shackling or handcuffing a defendant at trial is that it tends to negate the presumption of innocence by portraying the defendant as a bad or dangerous person. The Supreme Court has referred to shackling during trial as an ‘inherently prejudicial practice’ which may only be justified by an ‘essential state interest specific to each trial.’ Holbrook v. Flynn, 475 U.S. 560, 569, 106 S.Ct. 1340, 1346, 89 L.Ed.2d 525 (1986). See also Illinois v. Allen, 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970). This court recently has extended the general prohibition against shackling at trial to the sentencing phase of a death penalty case. Elledge v. Dugger, 823 F.2d 1439, 1450-52 (11th Cir.1987), modified, 833 F.2d 250 (1987), cert. denied, [485] U.S. [1014], 485 U.S. 1014, 108 S.Ct. 1487, 99 L.Ed.2d 715 (1988).
“‘“On the other hand, a defendant is not necessarily prejudiced by a brief or incidental viewing by the jury of the defendant in handcuffs. Allen v. Montgomery, 728 F.2d 1409, 1414 (11th Cir.1984); United States v. Diecidue, 603 F.2d 535, 549-50 (5th Cir.1979), cert. denied sub nom. Antone v. United States, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781, 446 U.S. 912, 100 S.Ct. 1842, 64 L.Ed.2d 266 (1980); Wright v. Texas, 533 F.2d 185, 187-88 (5th Cir.1976); Jones v. Gaither, 640 F.Supp. 741, 747 (N.D.Ga.1986), aff'd without opinion, 813 F.2d 410 (11th Cir.1987). The new fifth circuit is among those circuits which adhere to this rule. King v. Lynaugh, 828 F.2d 257, 264-65 (5th Cir.1987), vacated on other grounds, 850 F.2d 1055 (5th Cir.1988); see also United States v. Williams, 809 F.2d 75, 83-86 (1st Cir.1986), cert. denied, 481 U.S. 1030, 107 S.Ct. 1959, 2469, 2484, 95 L.Ed.2d 531, 877, 96 L.Ed.2d 377 (1987); United States v. Robinson, 645 F.2d 616, 617-18 (8th Cir.1981), cert. denied, 454 U.S. 875, 102 S.Ct. 351, 70 L.Ed.2d 182 (1981). In these latter cases, the courts generally have held that the defendant must make some showing of actual prejudice before a retrial is required.
““‘Thus, the case law in this area presents two ends of a spectrum. This case falls closer to the ‘brief viewing’ end of the spectrum and requires a showing of actual prejudice before a retrial is required. The prosecution showed the fifteen-minute tape twice during several days of trial. The handcuffs were only visible during short portions of the tape.
‘““Gat.es has made no attempt to show that he suffered actual prejudice because the jury saw him in handcuffs. Our independent examination of the record also persuades us that he did not suffer any prejudice. Although defense counsel strenuously objected to the admission of the videotape, he did not object to the handcuffing in particular. He did not ask for a cautionary instruction or a poll of the jury. Furthermore, the videotape at issue here was taken at the scene of the crime, not at the police station. Thus, jurors likely would infer that handcuffing was simply standard procedure when a defendant is taken outside the jail. The viewing of the defendant in handcuffs on television rather than in person further reduces the potential for prejudice. In light of the foregoing facts, and *1026 the fact that Gates sat before the jury without handcuffs for several days during his trial, we conclude that the relatively brief appearance of the defendant in handcuffs on the videotape did not tend to negate the presumption of innocence or portray the defendant as a dangerous or bad person. We therefore conclude on the particular facts of this case that the handcuffing of Gates during the videotaped confession does not require a new trial.”
“ ‘In this case, although the appellant is clearly wearing handcuffs during the interview, because the videotape is blurry in places, the handcuffs are not plainly visible all of the time. Rather, they are more noticeable when the appellant is moving his hands. Also, as in Gates, the defense did not object to the admission of the videotape on this ground or ask for a cautionary instruction; the viewing was on television rather than in person; and the appellant did not wear handcuffs or shackles during the actual trial. Finally, the appellant had been arrested on an outstanding warrant and not on the capital murder charge at the time he made his statement Therefore, under the facts of this ease we do not conclude that there was any plain error in this regard.’
“Barber v. State, 952 So.2d 393, 445-46 (Ala.Crim.App.2005).
“We have reviewed the videotape of Gobble’s third statement. At the beginning of questioning Gobble was in handcuffs but within seconds those handcuffs were removed. Gobble is sitting for the entire statement and is wearing an orange jumpsuit, but the jumpsuit appears to have no identifying marks or writing on the front; There is no evidence in the record that Gobble was wearing handcuffs or shackles during her trial. As did the Court in Barber, we find no evidence of prejudice. Accordingly, we find no plain error in regard to this claim.”
Gobble, — So.3d at-.
In Robitaille v. State, 971 So.2d 43, 64 (Ala.Crim.App.2005), Robitaille argued that the circuit court erred in admitting two videotapes that showed him “in handcuffs and shackles.” Robitaille maintained that the tapes were irrelevant, and that they were only introduced to show “bad character.” Robitaille, 971 So.2d at 64.
This Court disagreed. We wrote:
“We have reviewed the videotapes that were introduced. On each videotape Robitaille made statements to reporters. In the first videotape a reporter asked Robitaille: ‘Do you have anything to say?’ He replied: T never meant to hurt anybody.’ In the second videotape another reporter asked: ‘How are you doing? Anything you want to say to the Taylor family?’ He replied, ‘Sorry.’ The reporter then asked: ‘Sorry for what?’ Robitaille replied, ‘For what I did.’
“Rule 401, Ala.R.Evid., states: ‘ “Relevant evidence” means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.’
“ ‘Alabama courts have repeatedly held that the trial court has broad discretion in determining the admissibility of evidence, and that the trial court’s determination will not be reversed unless the court has abused its discretion. E.g., Gavin v. State, 891 So.2d 907, 963 (Ala.Crim.App.2003). Rule 402, Ala. R. Evid., states that all relevant evidence is admissible, unless otherwise precluded by law.... As with the determination of admissibili *1027 ty, trial courts have broad discretion in determining whether evidence is relevant, and a court’s determination will not be reversed unless the decision constituted an abuse of discretion. Gavin at 963.’
“Yeomans v. State, 898 So.2d 878, 894 (Ala.Crim.App.2004). ‘The test of relevancy sanctioned by the Alabama appellate courts has been described as a “liberal test of relevancy under which evidence is admissible if it has any probative value, however slight, upon a matter in the case.” ’ Moody v. State, 888 So.2d 532, 584 (Ala.Crim.App.2003), quoting McElroy’s Alabama Evidence § 21.01(1)(5th ed.1996).
“Clearly, the admissions made by Robitaille on the two videotapes were relevant to prove Robitaille’s guilt; therefore, the videotapes were correctly received into evidence at trial.
“Moreover, the fact that the videotapes showed Robitaille in handcuffs and shackles was not sufficient, in and of itself, to exclude their admittance. The Alabama Supreme Court in Ex parte Roberts, 735 So.2d 1270, 1275 (Ala.1999), addressing a similar claim, stated:
“ ‘We agree with the Court of Criminal Appeals that the trial court did not abuse its discretion in admitting the two photographs of Roberts retrieving evidence, even though those photographs showed him to be handcuffed. We are persuaded by the Court of Criminal Appeals’ reasoning and that of the cases upon which it relied, that a photograph of a defendant in handcuffs or otherwise detained may be admitted into evidence so long as the photograph has probative value and is relevant.’
“(Footnote omitted.) The videotapes of Robitaille’s admissions to reporters were correctly received into evidence.”
Robitaille v. State, 971 So.2d 43, 64-65 (Ala.Crim.App.2005).
Furthermore, with regard to photographic or video evidence, we have written:
“Photographic evidence is admissible in criminal prosecutions if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence. Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). The admission of photographic or videotape evidence is completely within the discretion of the trial court. Stewart v. State, 443 So.2d 1362, 1364 (Ala.Cr.App.1983). Matters resting in the sound discretion of the trial court will not be disturbed, absent a clear abuse of discretion. Pace v. State, 284 Ala. 585, 226 So.2d 645 (Ala.1969).”
Acklin v. State, 790 So.2d 975, 997 (Ala. Crim.App.2000), cert. denied, 790 So.2d 1012 (2001), cert. denied, Acklin v. Alabama, 533 U.S. 936, 121 S.Ct. 2565, 150 L.Ed.2d 729 (2001) (emphasis added).
This Court has reviewed the video recording in question. The time span from when LeMaster’s truck is first shown in the video until Phillips and Doster are escorted out of view of the camera is approximately 15 minutes. Contrary to Phillips’s assertions, neither Phillips nor Dost-er were shackled, nor does the video show the two being placed into law-enforcement vehicles. With the exception of the fact that the video appears to show Van Zant handcuffing Phillips before radioing for backup, the video is consistent with Van Zant’s testimony.
*1028 Based upon our independent viewing of the video, we are not persuaded that Phillips suffered any actual prejudice from the jury’s viewing of the video. The jurors were well aware that Phillips and Doster were suspects in a number of crimes in Alabama, including LeMaster’s murder, and the theft of his truck. Furthermore, the video depicts what one would expect to transpire when a lone law-enforcement officer stops a vehicle containing two persons who were wanted by law enforcement in another state.
This is not a situation where a defendant is handcuffed, shackled, or otherwise restrained within the confines of a courtroom, just a few feet from the jury, so that a juror would logically infer that the defendant is a danger to himself, the persons in the courtroom, and/or at risk for flight. In this case, there is no evidence indicating that Phillips was handcuffed or otherwise restrained in front of the jury during the trial. In fact, the record indicates that the circuit court took great care to ensure that the jurors did not view Phillips in shackles or otherwise restrained during the trial.
Furthermore, the video was relevant to the issues in the trial. The video confirmed that Phillips and Doster were traveling together in LeMaster’s truck in Texas approximately two weeks after their escape from the Covington County jail. The shoes Phillips was wearing in the video were determined to have been one of the pair of tennis shoes taken during the burglary at Florala High School. In addition, the video corroborated Phillips statement in his confession that he was wearing the stolen tennis shoes when he was arrested. The video also showed Phillips’s closely cropped hair, which corroborated his statement in his confession that Doster cut his hair while they were in Pettie’s trailer. Finally, the video showed what appeared to be Van Zant informing Phillips of his rights — Phillips does not dispute that was what was depicted in the video.
Accordingly, because we find that Phillips suffered no actual prejudice by the admission of the video recording, and because the video recording had probative value, the circuit court did not err in allowing the video into evidence. For the reasons set forth above, Phillips is due no relief on this claim.
IX.
Phillips lists 54 State’s exhibits that, he contends, were improperly allowed into evidence because, he says, the State failed to present a complete chain of custody with regard to the exhibits.[27] His argument is twofold.
First, Phillips maintains that the State did not establish a complete chain of custody because, he claims, the State failed to show that the exhibits remained secure after Walter Inabinett, the evidence technician, placed the exhibits into the evidence room. With regard to this assertion, Phillips argues that because the State did not present the testimony of the evidence technician who was in charge of the evidence room at the time of trial, the exhibits should not have been allowed into evidence. Second, Phillips argues that the State failed to establish a complete chain of custody because the State did not present the testimony of the Covington County circuit clerk to testify that the exhibits that were also admitted into evidence at his codefendant’s trial had not been tampered with or changed following that trial.
Near the end of the State’s case, Walter Inabinett was called to testify as a witness. Part of the purpose of his testimony was to “tie-up loose ends” with regard to some of the State’s exhibits that had already been *1029 identified and, in some cases, admitted into evidence before his testimony. Inabinett testified that he was employed with the Covington County Sheriffs Department from September 2000 until January 2007. Inabinett worked as an investigator from April 2001 until he left the employment of the Covington County Sheriffs Department. During his tenure with the Coving-ton County Sheriffs Department, Inabi-nett also served as the evidence technician from late 2002 until 2004.
Inabinett testified that the evidence room for the Covington County Sheriffs Department is located within the County Administrative Building, near the jail. It is a single room with no windows, and one door. Only the sheriff and the evidence technician have a key to the evidence room. Inabinett testified that whenever evidence is placed into or removed from the evidence room, it has to be done by the evidence technician because the technician has the key and maintains the evidence log.
Inabinett identified a number of State’s exhibits that he received and placed into the evidence room while he was the evidence technician. Inabinett testified that in each instance, he sealed the items and placed the items in the evidence room, in a sealed condition. According to Inabinett, the items remained in that sealed condition, with the exception of the times the items were viewed by the attorneys in Phillips or Doster’s cases, or when they were used in other court procedures in relation to the cases. Inabinett testified that he was present during those instances. He also testified that none of the items appeared to have been changed or altered, except for a whiskey bottle that was broken while it was in the evidence room.
Inabinett testified that Investigator Scott Conner assumed the duties of the evidence technician after Inabinett completed his term as evidence technician. Inabinett said that Sergeant Teddy Motley was the evidence technician at the time of trial, but he did not know when Motley assumed those duties.
In Vanpelt v. State, [Ms. CR-06-1539, December 18, 2009] — So.3d - (Ala. Crim.App.2009), this Court addressed a claim by Vanpelt that the trial court erred in allowing into evidence letters Van Pelt had written because, he argued, “no witness testified concerning the chain of custody of any of the letters.” Vanpelt, — So.3d at-.
This Court held that the letters were properly admitted. We reasoned:
“The Alabama Supreme Court in Ex parte Holton, 590 So.2d 918 (Ala.1991), addressed the requirements for a chain of custody:
“ ‘Proof of [an] unbroken chain of custody is required in order to establish sufficient identification of the item and continuity of possession, so as to assure the authenticity of the item. Id. In order to establish a proper chain, the State must show to a “reasonable probability that the object is in the same condition as, and not substantially different from, its condition at the commencement of the chain.” McCray v. State, 548 So.2d 573, 576 (Ala.Crim.App.1988).’
590 So.2d at 919-20. Later in Hale v. State, 848 So.2d 224 (Ala.2002), the Supreme Court reexamined its holding in Holton after the 1995 codification of § 12-21-13, Ala.Code 1975. The Supreme Court stated:
“‘Section 12-21-13, Ala.Code 1975, provides:
“ ‘ “Physical evidence connected with or collected in the investigation of a crime shall not be excluded from consideration by a jury or court due to a failure to prove the *1030 chain of custody of the evidence. Whenever a witness in a criminal trial identifies a physical piece of evidence connected with or collected in the investigation of a crime, the evidence shall be submitted to the jury or court for whatever weight the jury or court may deem proper. The trial court in its charge to the jury shall explain any break in the chain of custody concerning the physical evidence.”
“ ‘(Emphasis added.) This statute, by its terms, applies only to “[pjhysical evidence connected with or collected in the investigation of’ the charged crime. To invoke the statute the proponent of the evidence must first establish that the proffered physical evidence is in fact the very evidence “connected with or collected in the investigation.” Moreover,
“ ‘ “[i]n Land v. State, 678 So.2d 201 (Ala.Cr.App.1995), aff'd, 678 So.2d 224 (Ala.1996), a case which appears to rely on § 12-21-13, this court ruled that where a witness can specifically identify the evidence, and its condition is not an issue in the case, then the State is not required to establish a complete chain of custody in order for the evidence to be admitted into evidence. We stated: ‘The eyeglasses were admissible without establishing a chain of custody because [the testifying officer] was able to specifically identify them, and their condition was not an issue in the case.’ Land, 678 So.2d at 210.
“848 So.2d at 228 (emphasis in original and some citations omitted).
“Here, each of the exhibits was physical evidence that was collected in connection with the investigation of Sandra’s murder. Further, each exhibit was properly identified by a witness and the condition of the exhibits was not in issue. Accordingly, pursuant § 12-21-13, Ala.Code 1975, the exhibits were properly admitted.”
Vanpelt, — So.3d at-.
Phillips did not assert at trial, nor does he claim on appeal, that the exhibits were actually tampered with, altered, or contaminated once they were secured and locked in the evidence room by Inabinett. Rather, he seems to suggest that merely because Sergeant Teddy Motley, the evidence technician at the time of trial, did not testify that the exhibits had not been tampered with or altered while under his care, then the exhibits were inadmissible. We disagree.
Each contested exhibit listed by Phillips in his argument was identified by at least one, and sometimes more than one, witness as evidence that was “connected with or collected in the investigation” of the crimes charged. Inabinett identified the exhibits that he received, and he testified in detail about the steps that he took to safeguard the exhibits while he was the evidence technician.
This Court has reviewed the record, and there is no indication from the record that the contested exhibits were improperly tampered with or altered. Accordingly, even though the evidence technician who was in charge of the evidence at the time of trial did not testify at the trial, this does not render the evidence inadmissible in this case, and we find no error in the circuit court’s allowing the exhibits into evidence.
As noted above, Phillips also argues that the contested exhibits were inadmissible because the Covington County Circuit Clerk did not testify that the exhibits that were also introduced at Doster’s trial had not been altered or tampered with since Doster’s trial.
In Dority v. State, 586 So.2d 973 (Ala. Crim.App.1991), this Court addressed a *1031 claim that the trial court erred in admitting cocaine into evidence because the circuit clerk did not testify as a chain-of-custody witness regarding the cocaine, which had been introduced into the code-fendant’s trials and which had been secured in the clerk’s office since the trials. We held that “[t]he failure of the circuit clerk to testify constituted a weak link rather than a missing link in the chain of custody.” Dority, 586 So.2d at 977. We explained:
“ ‘ “The purpose of requiring that the chain of custody be shown is to establish to a reasonable probability that there has been no tampering with the evidence. Williams v. State, 375 So.2d 1257 (Ala.Cr.App.), cert. denied, 375 So.2d 1271 (Ala.1979); Tate v. State, 435 So.2d 190 (Ala.Crim.App. 1983); Smith v. State, 446 So.2d 68 (Ala.Cr.App.1984) ‘The evidence need not negate the most remote possibility of substitution, alteration, or tampering with the evidence, but rather must prove to a reasonable probability that the item is the same as, and not substantially different from, the object as it existed at the beginning of the chain.’ Slaughter v. State, 411 So.2d 819, 822 (Ala.Cr.App.1981) (emphasis supplied).” ’
“Ex parte Williams, 505 So.2d 1254, 1255 (Ala.1987) (quoting this court in Williams v. State, 505 So.2d 1252 at 1253 (Ala.Cr.App.1986).) ‘A weak link in the chain of custody presents a question of credibility and weight for the jury rather than a question of admissibility.’ Holton v. State, [590 So.2d 914 (Ala.Crim.App.1990) ].”
Dority, 586 So.2d at 977 (emphasis added).
Again, Phillips does not argue that the exhibits were actually tampered with or altered while they were in the care of the circuit clerk following Doster’s trial. Rather, he intimates that the absence of the Covington County Circuit Clerk’s testimony renders the exhibits inadmissible.
For the same reasons that we set forth above in addressing his first contention, we find no error in the circuit court’s allowing the contested exhibits into evidence, notwithstanding the fact that the circuit clerk did not testify regarding the care and condition of the exhibits following Doster’s trial.
Accordingly, Phillips is due no relief on these claims.
X.
Phillips contends that the prosecutor improperly commented on his failure to testify at trial during his closing argument at the guilt phase of the trial.[28] Phillips cites seven excerpts from the prosecutor’s closing argument in support of his assertion.
At the beginning of the prosecutor’s closing argument, the prosecutor told the jury:
“Now y’all know as well as I do, you’ve heard it from the court at the beginning of the trial; you heard it from the court in its instructions what the lawyers say in argument is just that. It’s argument. What the lawyers say isn’t evidence.
But what the defendant said to the police, that is evidence. What was collected at the crime scenes, that is evidence. What was collected in Paul Le-Master’s truck as it was found in Texas, that is evidence. What was analyzed by the forensic scientists, that is evidence.
“But since my words are argument, in my closing arguments today, I’ve decided that I’m going to take the defendant’s confession and I’m going to let him help me with my closing arguments. And as I go through each and every one of these crimes and show how we have *1032 proven them beyond a reasonable doubt, I’m going to interject things here and there, things he left out, things that he didn’t tell us, things that he may have fibbed a little bit on. Why would he do that? We’ll talk about that in a minute.”
(R. 8478-79.)
The prosecutor continued his closing argument, during which he compared and contrasted Phillips’s statement that he made to the investigators to the other evidence that had been presented at trial. At various points during his closing argument, the prosecutor directed the jury’s attention to portions of Phillips’s statement to the investigators in which Phillips omitted some incriminating or unflattering details, and it is during that portion of the prosecutor’s argument that the following contested comments occurred:
“But you know, there’s one thing about this that [Phillips] leaves out. Now he talks about how they ate but he leaves out the fact about how they just made themselves at home, and also about how they trashed the place.”
(R. 3484-85.)
“And then [Phillips] comes down and he says and we got into that trailer. Well, he leaves out a little something, doesn’t he? He leaves out the fact that they broke in the back door.”
(R. 3489.)
“Jason Pettie said he walked in and his trailer was trashed. But they leave that — he leaves out that detail.”
(R. 3490.)
“What does he forget to mention? Oh, yeah. We took the ammunition for each one of these guns, too.”
(R. 3491.)
“Now we’ll find out later he did a little bit more than he says there.”
(R. 3502.)
“And again, he doesn’t talk about how they [Phillips and his codefendant] trash the pulpit of a church and how they go into a church and trash the pulpit looking for money.”
(R. 3523.)
“Now earlier I told you about how the defendant put a spin on certain things. He told us the truth, very detailed statement, but he left out details and he left out certain things. For instance — ”
(R. 3530.)
After this last purportedly improper comment occurred, defense counsel objected, and the following discussion took place outside the hearing of the jury:
“[DEFENSE COUNSEL]: This is the fourth time that they have talked about the defendant leaving out things. We believe that is an improper prosecu-torial argument in that the defendant did not take the stand. The only person that could explain these items or inconsistencies in his statement would be for him to have taken the stand. And we believe that this is the fourth, I believe, comment that the state has stated that he has either forgotten to mention or he cannot explain or this last time that he did not explain. And we believe them to be improper prosecutorial comment on our defendant not taking the stand and we object.
“[PROSECUTOR]: I made no mention of that, Judge. What we know from the evidence and the statement he gave police, he’s left out details from what we know in the evidence.
“THE COURT: Overruled.”
(R. 3530-31.) (Emphasis added.)
Because Phillips timely objected to just one of the prosecutor’s comments, the remaining comments will be reviewed for plain error only. Rule 45A, Ala.R.App.P.
‘“This court has stated that “[i]n reviewing allegedly improper prosecu- *1033 torial comments, conduct, and questioning of witnesses, the task of this court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract.” Bankhead v. State, 585 So.2d 97, 106 (Ala.Cr.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Cr.App. 1992), rev’d on other grounds, 625 So.2d 1146 (Ala.1993). See also Henderson v. State, 588 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992). “In judging a prosecutor’s closing argument, the standard is whether the argument ‘so infected the trial with unfairness as to make the resulting conviction a denial of due process.’” Bankhead, 585 So.2d at 107, quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). “A prosecutor’s statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury.” Roberts v. State, [735 So.2d 1244 (Ala.Cr.App.1997) ], aff'd, [735 So.2d 1270 (Ala.), cert. denied, 5[2]8 U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999)]. Moreover, “statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.” Bankhead, 585 So.2d at 106. “Questions of the propriety of argument of counsel are largely within the trial court’s discretion, McCullough v. State, 357 So.2d 397, 399 (Ala.Cr.App. 1978), and that court is given broad discretion in determining what is permissible argument.” Bankhead, 585 So.2d at 105. We will not reverse the judgment of the trial court unless there has been an abuse of that discretion. Id.’
“Freeman v. State, 776 So.2d 160 (Ala. Cr.App.1999).
“A comment on the defendant’s failure to testify is to be ‘scrupulously avoided.’ Arthur v. State, 575 So.2d 1165, 1186 (Ala.Cr.App.1990), cert. denied, 575 So.2d 1191 (Ala.1991). ‘Every time a prosecutor stresses a failure to present testimony, the facts and circumstances must be closely examined to see whether the defendant’s right to remain silent has been violated.’ Windsor v. State, 593 So.2d 87, 91 (Ala.Cr.App.1991), quoting Padgett v. State, 45 Ala.App. 56, 223 So.2d 597, 602 (1969). ‘In a case where there has been only an indirect reference to a defendant’s failure to testify, in order for the comment to constitute reversible error, there must be a close identification of the defendant as the person who did not become a witness.’ Windsor v. State, supra, quoting, Ex parte Williams, 461 So.2d 852 (Ala. 1984).
“‘“Alabama law clearly holds that ‘[w]here there is the possibility that a prosecutor’s comment could be understood by the jury as reference to failure of the defendant to testify, Art. I, § 6 [Const, of Alabama of 1901], is violated.’ ” Ex parte Wilson, 571 So.2d 1251, 1262 (Ala.1990). However, ‘a prosecutor may legitimately base his argument on the evidence of the appellant’s statement’ to the police. Hereford v. State, 608 So.2d 439, 442 (Ala.Cr.App.1992). See also Henderson v. State, 584 So.2d 841, 855 (Ala.Cr.App.1988); Smith v. State, 588 So.2d 561, 570 (Ala.Cr.App.1991); *1034 Kimble v. State, 545 So.2d 228, 230 (Ala.Cr.App.1989); Brinks v. State, 500 So.2d 1311, 1314-15 (Ala.Cr.App. 1986). ‘Argument by the prosecution concerning omissions and inconsistencies in the defendant’s version of the case is not improper.’ Salter v. State, 578 So.2d 1092, 1096 (Ala.Cr. App.1990), cert. denied, 578 So.2d 1097 (Ala.1991).” ’
“Mosely v. State, 628 So.2d 1041, 1042 (Ala.Cr.App.1993).”
Taylor v. State, 808 So.2d 1148, 1185-1187 (Ala.Crim.App.2000), aff'd, 808 So.2d 1215 (Ala.2001), cert, denied, Taylor v. Alabama, 534 U.S. 1086, 122 S.Ct. 824, 151 L.Ed.2d 705 (2002) (emphasis added). See also Burgess v. State, 827 So.2d 134, 168 (Ala.Crim.App.1998) (“It was not an impermissible comment on Burgess’s right to remain silent for the prosecutor to question Burgess’s truthfulness in making his statement.”).
With the above principles in mind, we have reviewed the objectionable comments in the context of the entire closing argument, and in light of all the evidence presented at trial, and we do not believe that the comments could be understood by the jury to be comments on Phillips’s failure to testify. Rather, the prosecutor was drawing the legitimate inference from the omissions in Phillips’s statement when compared with the other evidence at trial, that Phillips was attempting to portray himself in the best light to the investigators and, consequently, that some portions of his statement were not accurate or completely truthful. The prosecutor was also encouraging the jury not to dismiss the entire confession simply because there were portions of the confession where Phillips omitted certain facts, or because there were portions of the confession that were inconsistent with the other evidence.
The prosecutor explained to the jury:
“What we note from the evidence, the defendant has left out some details.... These are just little things that the defendant glazes over in his statement trying to lead the police away from what’s actually going on here.
“The defendant’s caught. He knows he’s caught. He’s just been arrested in a dead man’s truck full of property stolen from all over Covington County. He knows he’s caught and so all he can do at this point is damage control. And so he confesses, but he tries to put a spin on it to make it sound like what he did wasn’t so God awful.”
(R. 3531-33.) The prosecutor reiterated this point in his rebuttal closing argument when he stated: “And his act of confession was an act of desperation as well. He wanted to give the police his version of things and wanted to put some spin on it if he could.” (R. 3571.)
Furthermore, even though Phillips claims on appeal that the prosecutor’s remarks constituted a direct reference on his failure to testify, this was not how defense counsel ultimately interpreted these remarks at trial, as evidenced by the following excerpt from defense counsel’s closing argument:
“Okay, You heard the taped statements of the defendant, Mr. Bobby Phillips .... Well, let’s look closely at Mr. Phillips’s statement and find out really what we know from there. I call your attention to the closing arguments of the District Attorney, Mr. Gambril.... Numerous times [he] talked about the statement of Mr. Phillips and how he left things out or had changed things or he did this or did that in his statement. You recall that. Yeah. He discusses those events in a very complete, appears to be, and very sincere manner. But let’s look at his statement. Not in what he didn’t say or should have said, but *1035 let’s look at Ms statement as dealing with the physical evidence that’s presented.”
(R. 3557-58.)(Emphasis added.)
Last, we note that the circuit court instructed the jury that the arguments of counsel were not to be considered as evidence and that Phillips had a right not to testify and that no negative inferences could be drawn from his failure to testify.
For the reasons set forth above, we find no error, plain or otherwise, in the prosecutor’s comments cited by Phillips in his brief. The comments were neither a direct nor an indirect comment on Phillips’s failure to testify; rather, the prosecutor’s remarks were permissible comments on the truthfulness of Phillips’s statement to the Alabama investigators. Accordingly, Phillips is due no relief on this claim.
XI.
Phillips contends that the circuit court erred in denying his motion for a new trial without an evidentiary hearing.[29]
“‘“A defendant is not entitled to a hearing on a motion for new trial without a special basis therefor.” ’ Clark v. State, 621 So.2d 309, 327 (Ala.Crim.App. 1992), quoting Smelcher v. State, 520 So.2d 229, 232 (Ala.Crim.App.1987). See also Arrington v. State, 757 So.2d 484 (Ala.Crim.App.1999). ‘[B]are allegations that the trial court had erred’ are not sufficient to warrant an evidentiary hearing on a motion for a new trial. Meeks v. State, 697 So.2d 60, 61 (Ala. Crim.App.1996). Moreover, unless the grounds are sufficiently specific and supported by facts contained in the record, a motion for a new trial must be verified and supported by affidavit. See, e.g., Ex parte Jefferson, 749 So.2d 406 (Ala. 1999); Jones v. State, 727 So.2d 866 (Ala.Crim.App.1998); and Hill v. State, 675 So.2d 484 (Ala.Crim.App.1995). ‘Assertions of counsel in an unverified motion for new trial are bare allegations and cannot be considered as evidence or proof of the facts alleged.’ Smith v. State, 364 So.2d 1, 14 (Ala.Crim.App. 1978). “‘Error may not be predicated upon the overruling of a motion for new trial where there was no evidence offered in support of the motion.” ’ Britain v. State, 518 So.2d 198, 203 (Ala.Crim. App.1987), quoting Tucker v. State, 454 So.2d 541, 547-48 (Ala.Crim.App.1983), rev’d on other grounds, 454 So.2d 552 (Ala.1984). See also Arnold v. State, 601 So.2d 145, 154 (Ala.Crim.App.1992) (‘There is no error in a trial court’s denial of a motion for new trial where no evidence is offered in support of that motion.’).”
Washington v. State, 922 So.2d 145, 176-77 (Ala.Crim.App.2005).
Phillips’s motion for new trial consisted of 14 one-sentence, bare, conclusory allegations; the motion was not verified or supported by affidavits. Accordingly, we find no abuse of discretion in the circuit court’s summary denial of Phillips’s motion for a new trial.

Sentencing Issues

XII.
Phillips requests that this Court bar the imposition of the death penalty because, he suggests, neither this Court nor the Alabama Supreme Court engage in a meaningful proportionality review, as directed in § 13A-5-53(b)(3), Ala.Code 1975.[30] Phillips argues:
“In applying Alabama Code § 13A-5-53(b)(3), Alabama courts have failed to consider the unique circumstances of each individual when determining *1036 whether a given death sentence is proportionate to the offense; rather, appellate courts have regularly limited the scope of their proportionality review to the aggravating circumstance that elevates the crime to a capital offense.... In fact, no Alabama court has ever found a death sentence to be disproportionate to the offense for which he or she was convicted. In Alabama, the proportionality requirement has been interpreted to mean that a death sentence is not disproportionate as long as the defendant was found guilty of a capital offense and at least one other person has previously been found guilty of the same offense.”
(Phillips’s brief, at 139-40.)
We take exception to Phillips’s suggestion that this Court’s proportionality review is essentially a sham and that when addressing § 13A-5-53(b)(3) this Court does little more than ensure that “at least one other person has previously been found guilty of the same offense.” (Phillips’s brief, at 139-40.) Although § 13A-5 — 53(c), Ala.Code 1975, does require this Court to address each of the subsections of § 13A-5-53(b), Ala.Code 1975, it does not require this Court to make specific factual findings regarding each of those sections. Therefore, one cannot infer from the lack of specific findings with regard to the proportionality review required by § 13A-5-53(b)(3), Ala.Code 1975, that this Court did not engage in the necessary review.
Perhaps Justice Maddox’s special concurrence in Ex parte Tarver, best addresses Phillips’s assertion:
“This Court, in Beck v. Alabama, 396 So.2d 645 (Ala.1981), spelled out the rule in this State for appellate review of death sentences, as follows:
“ ‘The United States Supreme Court, in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), expressed its approval of Georgia’s appellate review process in capital punishment cases. The Georgia procedures require that the appellate court (the State Supreme Court in Georgia) review every death sentence to determine (1) whether it was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether the evidence supports the findings of a statutory aggravating circumstance; and (3) whether the sentence as imposed is excessive or disproportionate in relation to the penalty imposed in similar cases, considering both the crime and the defendant.
“ ‘The procedure we adopt requires that the reviewing court examine cases in which the death penalty is imposed and ascertain that the death penalty is imposed with some uniformity and that its imposition is not substantially out of line with sentences imposed for other acts. In other words, the reviewing court should not affirm a death sentence unless the death penalty is being imposed generally in similar cases throughout the state.
“ ‘In Alabama, a sentence of death is automatically reviewed by the Court of Criminal Appeals and, if affirmed, is then automatically reviewed on petition for certiorari by this Court. Rule 39(k), Alabama Rules of Appellate Procedure, provides:
“ ‘ “In all cases in which the death penalty has been imposed, upon review of the opinion of the court of criminal appeals on certiorari, the supreme court may notice any plain error or defect in the proceeding under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has *1037 adversely affected the substantial rights of the petitioner.”
‘“This procedure adds one step of review to the Georgia procedure and, therefore, adds one more safeguard to insure that the death sentence is not being imposed arbitrarily or capriciously. Furthermore, ARAP Rule 39(k) provides a “plain error” scope of review applicable to death penalty cases only.
“ ‘To insure that sentences of death will not be arbitrarily and capriciously imposed, we hold that both the Court of Criminal Appeals and this Court should examine all death sentences in light of the standards and procedure approved in Gregg. Each death sentence should be reviewed to ascertain whether the crime was in fact one properly punishable by death, whether similar crimes throughout the state are being punished capitally and whether the sentence of death is appropriate in relation to the particular defendant. In making this final determination, the courts should examine the penalty imposed upon the defendant in relation to that imposed upon his accomplices, if any.’
“This standard of appellate review, I believe, is consistent with the standard of review approved by the Supreme Court of the United States.
“I believe that in Beck v. Alabama, 396 So.2d 645 (Ala.1981), this Court ‘built into the judicial machinery checks against the freakish imposition of the death penalty.’ (Adams, J., concurring specially, 396 So.2d, at 666).
“I believe that the Court of Criminal Appeals and this Court are seriously considering their roles as appellate courts and are conscientiously applying the Beck standards on review, and are not automatically affirming the determinations made by trial judges of the appropriateness of death sentences
Ex parte Tarver, 553 So.2d 633, 635 (Ala. 1989), cert. denied, 494 U.S. 1090, 110 S.Ct. 1837, 108 L.Ed.2d 966 (1990) (Maddox, J., concurring specially) (footnote omitted)(emphasis added).
XIII.
Phillips claims that Alabama’s capital-punishment “system” is unconstitutional because, he contends, there are no statewide standards to ensure that prosecutors’ decisions to seek the death penalty are uniform across jurisdictions.[31] Phillips maintains that under the current system, “prosecutors are free to base these life and death decisions on personal, irrelevant, and improper criteria,” which, he argues, results in geographic disparities in the imposition of capital punishment among similarly situated persons. (Phillips’s brief, at 142^14.)
Phillips cites Bush v. Gore, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000), for the proposition that “claims like this one and the one in Bush are not based on an individual act of discrimination, but rather challenge a system in which uncontrolled official discretion makes arbitrary and unequal treatment inevitable.” (Phillips’s brief, at p. 142.)(Emphasis added.) Bush v. Gore involved a 2000 presidential election vote-counting controversy in the State of Florida, in which the Supreme Court held that where a state court orders a statewide vote recount, “there must be at least some assurance that the rudimentary requirements of equal treatment and fairness are satisfied.” Bush, 531 U.S. at 109, 121 S.Ct. 525. A claim similar to the one Phillips raises — also predicated on the holding in Bush v. Gore—was raised in Lewis v. State, 24 So.3d 480 (Ala.Crim. *1038 App.2006), aff'd, 24 So.Sd 540 (Ala.2009), cert. denied, Lewis v. Alabama, — U.S. -, 130 S.Ct. 796, 175 L.Ed.2d 562 (2009). Rejecting that claim, we noted: “We fail to see how this decision lends support for Lewis’s claim, given that the Supreme Court took care to state that its decision was ‘limited to the present circumstances,’ noting that ‘the problem of equal protection in election processes generally present many complexities.’ 531 U.S. at 109, 121 S.Ct. 525.” 24 So.3d at 536.
The core of Phillips’s argument is that allowing prosecutorial discretion in determining whether to seek the death penalty results in unequal and disparate treatment of similarly situated persons across jurisdictions in Alabama. He makes the suggestion that Alabama’s current capital-punishment system enables prosecutors to selectively prosecute cases based upon their own personal biases and agendas, rather than upon the law and the facts of the case.[32] Phillips’s contention has previously been addressed and rejected by this Court.
In Beck v. State, 365 So.2d 985 (Ala. Crim.App.1978), aff'd, 365 So.2d 1006 (Ala. 1978), rev’d on unrelated ground, Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), the appellant claimed that Alabama’s death-penalty statute violated the Equal Protection Clause because, he contended:
“The grand jury alone, under the influence of the district attorney of a county, makes the determination of the existence of any aggravating circumstances, and it is from the district attorney that the grand jury hears evidence of aggravating circumstances.”
Beck, 365 So.2d at 999. He claimed that “[tjhis is a one-sided presentation of evidence and the ‘chilling fact is that the local district attorney alone makes the decision to try a defendant under the new death penalty act.’ ” Beck, 365 So.2d at 999.
This Court rejected Beck’s claim:
“The Alabama death penalty statute, supra, provides for sentence of death involving murder with aggravation. With this guidance we cannot accept [Beck’s] assertion ... that district attorneys of this State will systematically fail to file capital murder charges, when the evidence warrants it, or seek convictions on inadequate evidence.
“Someone must exercise this discretion and judgment as to what charges are to be filed and against whom. This is part of our criminal justice system and is essential to its operation and enforcement. The discretion reposing in Alabama’s district attorneys is no more than that invested in other prosecutors across this country. It furnishes no basis for inferring that capital crimes will be prosecuted on an arbitrary and capricious basis. Also, that capital murders will be prosecuted so frequently and arbitrarily that our death penalty statute would be void under Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, is an invalid assumption.”
Beck, 365 So.2d at 999-1000.
Likewise, we reject Phillips’s suggestion that prosecutors across this State are selectively choosing to prosecute or not to prosecute individuals for capital offenses based on the prosecutor’s own personal agenda or biases. Phillips is due no relief on this claim.
XIV.
Phillips contends that this Court should bar imposition of the death penalty be *1039 cause, he claims, Alabama’s death-penalty statute “fails to constitutionally narrow the class of people sentenced to death.”[33] This assertion has been addressed and rejected by this Court. See, Vanpelt v. State, [Ms. CR-06-1539, December 18, 2009] — So.3d-(Ala.Crim.App.2009). Phillips is due no relief on this claim.

XV.

In Phillips’s last argument, he contends that Alabama’s method of performing lethal injection violates the Eighth Amendment ban on cruel and unusual punishment and that it is “inconsistent with society’s evolving standards of decency.”[34] This Court has previously addressed and rejected this contention. In Gobble v. State, we wrote:
“Gobble argues that evolving standards of decency have rendered Alabama’s method of performing lethal injection unconstitutional. She cites the article, Leonidas G. Koniaris, Inadequate Anaesthesia in Lethal Injection for Execution, 365 Lancet 1412 (2005), to support her argument. This study was based on the improper administering of the first drug — sodium thiopen-tal — which acts as an anaesthesia. The United States Supreme Court cited this study in Baze v. Rees, 553 U.S. 35, n. 2, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008). Alabama’s method of performing lethal injection, a three-drug protocol, is substantially similar to the one considered by the United States Supreme Court in Baze v. Rees.
“The Alabama Supreme Court in Ex parte Belisle, 11 So.3d 323 (Ala.2008), held that Alabama’s method of performing lethal injection does not constitute cruel and unusual punishment. The Court stated:
“ ‘The Eighth Amendment to the United States Constitution provides: “Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.” “Punishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel within the meaning of that word as used in the constitution. It implies there something inhuman and barbarous, — something more than the mere extinguishment of life.” In re Kemmler, 136 U.S. 436, 447, 10 S.Ct. 930, 34 L.Ed. 519 (1890). However, as the Supreme Court of the United States recently stated in Baze v. Rees, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008):
“ ‘ “Our cases recognize that subjecting individuals to a risk of future harm — not simply actually inflicting pain — can qualify as cruel and unusual punishment. To establish that such exposure violates the Eighth Amendment, however, the conditions presenting the risk must be ‘sure or very likely to cause serious illness and needless suffering,’ and give rise to ‘sufficiently imminent dangers.’ Helling v. McKinney, 509 U.S. 25, 33, 34-35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (emphasis added). We have explained that to prevail on such a claim there must be a ‘substantial risk of serious harm,’ an ‘objectively intolerable risk of harm’ that prevents prison officials from pleading that they were ‘subjectively blameless for purposes of the Eighth Amendment.’ Farmer v. Brennan, 511 U.S. 825, 842, 846, and n. 9, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).’
*1040 ‘“553 U.S. at [49-50], 128 S.Ct. at 1580-31.
“‘In Baze, two death-row inmates challenged Kentucky’s use of the three-drug protocol, arguing “that there is a significant risk that the procedures will not be properly followed—in particular, that the sodium thiopental will not be properly administered to achieve its intended effect-resulting in severe pain when the other chemicals are administered.” 553 U.S. at [49], 128 S.Ct. at 1530. Belisle’s claim, like the claims made by the inmates in Baze, “hinges on the improper administration of the first drug, sodium thiopental.” Baze, 553 U.S. at [53], 128 S.Ct. at 1533.
“‘The Supreme Court upheld the constitutionality of Kentucky’s method of execution, Baze, 553 U.S. at [62— 64], 128 S.Ct. at 1538, and noted that “[a] State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard.” Baze, 553 U.S. at [61], 128 S.Ct. at 1537. Justice Ginsburg and Justice Souter dissented from the main opinion, arguing that “Kentucky’s protocol lacks basic safeguards used by other States to confirm that an inmate is unconscious before injection of the second and third drugs.” Baze, 553 U.S. at [114], 128 S.Ct. at 1567 (Ginsburg, J., dissenting). The dissenting Justices recognized, however, that Alabama’s procedures, along with procedures used in Missouri, California, and Indiana “provide a degree of assurance — missing from Kentucky’s protocol — that the first drug had been properly administered.” Baze, 553 U.S. at [121], 128 S.Ct. at 1571 (Ginsburg, J., dissenting).
“ ‘The State argues, and we agree, that Belisle, like the inmates in Baze, cannot meet his burden of demonstrating that Alabama’s lethal-injection protocol poses a substantial risk of harm by asserting the mere possibility that something may go wrong. “Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of ‘objectively intolerable risk of harm’ that qualifies as cruel and unusual.” Baze, 553 U.S. at [50], 128 S.Ct. at 1531. Thus, we conclude that Alabama’s use of lethal injection as a method of execution does not violate the Eighth Amendment to the United States Constitution.’
“11 So.3d at 338-39. Alabama’s method of performing lethal injection is not cruel and unusual.”
Gobble v. State, [Ms. CR-05-0225, February 5, 2010], — So.3d -, - (Ala. Crim.App.2010.) (footnote omitted). See also Morris v. State, 60 So.3d 326 (Ala. Crim.App.2010); Vanpelt v. State, [Ms. CR-06-1539, December 18, 2009], — So.3d-(Ala.Crim.App.2009).
Accordingly, Phillips is due no relief on his claim.
XVI.
As required by § 13A-5-53, Ala. Code 1975, we will now address the propriety of Phillips’s death sentence.
Phillips was convicted of three counts of capital murder: (1) murdering Paul Le-Master during a burglary in the first degree, see § 13A-5-40(a)(4), Ala.Code 1975; (2) murdering Paul LeMaster during a robbery in the first degree, see 13A-5-40(a)(2), Ala.Code 1975; and (3) murdering Paul LeMaster by shooting him while Phillips was outside the dwelling and LeMaster was inside the dwelling, see § 13A-5-40(a)(16), Ala.Code 1975. The jury, by a vote of 12-0, recommended that Phillips be sentenced to death.
*1041 Pursuant to § 13A-5-53(a), Code of Alabama, we have reviewed the sentencing proceedings and we find no error adversely affecting Phillips’s rights during the sentencing proceedings. In its sentencing order, the circuit court found the existence of three statutory aggravating circumstances: (1) that the capital offense was committed while Phillips was under a sentence of imprisonment, see § 13A — 5—49(1), Ala.Code 1975; (2) that the capital offense was committed while Phillips “was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit, ... burglary,” see § 13A-5-49(4), Ala. Code 1975; and (3) that the capital offense was committed while Phillips was “engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit, ... robbery,” see § 13A-5-49(4), Ala.Code 1975.
As required by § 13A-5-47(d), the circuit court made specific written findings that none of the remaining statutory factors listed in § 13A-5-49, Ala.Code 1975, existed in this case. The circuit court indicated that it assigned no weight to those factors.
The circuit court did not find the existence of any of the statutory mitigating circumstances enumerated in § 13A-5-51, Ala.Code 1975. However, pursuant to § 13A-5-52, Ala.Code 1975, the circuit court did find the following nonstatutory mitigating circumstances: (1) Phillips’s alcohol consumption prior to the murder; (2) Phillips’s past and present mental-health issues; and (3) Phillips’s decision to confess and his expression of remorse.
Pursuant to § 13A-5-53(a), Ala.Code 1975, this Court has reviewed the record, and we determine that the circuit court’s findings regarding the aggravating and mitigating circumstances are supported by the evidence.
Because we find that no error adversely affecting Phillips’s rights was made in the sentence proceedings and that the circuit court’s findings concerning the aggravating and mitigating circumstances are supported by the evidence, we shall now proceed to review the propriety of the decision that death was the proper sentence.
In determining whether death is the appropriate sentence, this Court will specifically address each of the factors enumerated in § 13A-5-53(b), Ala.Code 1975:
The record reflects that Phillips’s sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(l), Ala. Code 1975.
After an independent weighing of the aggravating and mitigating circumstances, we agree that death is the proper sentence. See § 13A-5-53(b)(2), Ala.Code 1975.
Section 13A-5-53(b)(3), Ala.Code 1975, requires this Court to determine whether Phillips’s death sentence is disproportionate or excessive when compared to the penalties imposed in similar cases. Phillips was convicted of one count of murder during the course of a burglary, one count of murder during a robbery, and one count of shooting the victim from outside the dwelling while the victim was inside the dwelling. These offenses are defined by statute. See § 13A-5-40(a)(2), (a)(4), and (a)(16), Ala.Code 1975.
Considering the crime committed and Phillips, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases. “ ‘ “In fact, two-thirds of the death sentences imposed in Alabama involve cases of robbery/murder.” ’ ” Stallworth v. State, 868 So.2d 1128, 1188 (Ala.Crim.App.2001). For burglary/murder, see Belisle v. State, *1042 11 So.3d 256, 322 (Ala.Crim.App.2007), and cases cited therein.
Finally, as required by Rule 45A, Ala. R.App.P., we have thoroughly examined the record for any error that may have adversely affected Phillips’s substantial rights with respect to Phillips’s capital-murder convictions and his sentence of death, whether or not brought to our attention or to the attention of the circuit court. We find no plain error or defect in the proceedings.
Based upon the foregoing, Phillips’s capital-murder convictions and his sentence of death are affirmed.
AFFIRMED.
WISE, P.J., and WELCH, WINDOM, and MAIN, JJ., concur.

. Before submitting the case to the jury, the circuit court granted the State's motion to dismiss the capital-murder charges contained in counts VI, VIII, and IX of the indictment. At the same time, the State also dismissed Count XII of the indictment, which charged Phillips with the first-degree theft of property of various items belonging to Paul LeMaster, because this charge was a lesser-included offense of the capital murder charge of murder during the course of a first-degree robbery, contained in Count X of the indictment.

. Oscar Roy Doster was also convicted of three counts of capital murder and was sentenced to death. His appeal is currently pending before this Court. Oscar Roy Doster v. State of Alabama, CR-06-0323.

. After the selection of the jury, the circuit court granted the State’s motion to reduce the charge of first-degree escape to charge the lesser-included offense of second-degree escape. This avoided the possible prejudice to Phillips of the State's having to prove that Phillips escaped from custody after having been convicted of a felony, a necessary element to sustain a conviction for first-degree escape. See § I3A-10-31, Ala.Code 1975.

. The State introduced evidence of 16 prior felony convictions.

. Before the case was submitted to the jury, the State reduced the charge from criminal mischief in the first degree, see § 13A-7-21, Ala.Code, to charge the lesser-included offense of criminal mischief in the third degree. (Vol.17, R. 3319-20.)

. Before the case was submitted to the jury, the State reduced the charge from criminal *980 mischief in the first degree, see § 13A-7-21, Ala.Code 1975, to the lesser-included offense of criminal mischief in the third degree.

. Unless otherwise noted, all subsequent dates referenced in these facts are from the month of November 2002.

. Although not specifically identified by name in the record, it appears that the “river” referenced was the Conecuh River and/or the two adjacent reservoirs north of Andalusia in Covington County.

. A receipt from a motel in Houston and a card-key envelope with the name of Michael Phillips written on it, which were later found in papers discarded from LeMaster’s truck, indicated that Phillips and Doster stayed in Houston, Texas, from November 6 through some time on November 8.

. For a detailed discussion of Phillips’s arrest, see Part VIII of this opinion.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. For a detailed discussion of the facts leading to Phillips’s confession, see part VII of this opinion.

.Phillips told the investigators that he ejected the cartridge from the rifle immediately after shooting LeMaster; however, no cartridge was found at the scene of the shooting. Phillips said that the cartridge found in the discarded items from LeMaster’s truck came from a time when Doster fired the rifle at a road sign.

. This argument was presented in Phillips's brief on appeal at pp. 128-132; this issue is identified as Issue X in the table of contents, but as Issue XIII on page 128.

. This argument was presented in Issue I in Phillips's brief on appeal.

. This argument was presented in Issue II in Phillips’s brief on appeal.

. This argument was presented in Issue III in Phillips’s brief on appeal.

. This argument was presented in Issue V in Phillips’s brief on appeal.

. In support of his argument, Phillips refers this Court to several newspaper articles regarding Phillips and Doster that were filed in support of Phillips's motion for change of venue. (Vol.28, C. 1640-1722.) He also refers this Court to the circuit court's sentencing order in Doster's record on appeal to this Court. In the referenced portion of that sentencing order, the circuit judge wrote:
"Again, at the second sentencing phase, the State put on hearsay testimony that implicated the Defendant [Doster] in an additional murder that took place during his second escape from custody. The Court gives absolutely no weight to the hearsay admitted about the events and circumstances connected to the death of Dennis Courtney because proof in that regard is too speculative.”
Doster v. State, (CR-06-0323) at C. 3406, n. 28.

. This argument was presented in Issue VI in Phillips’s brief on appeal.

. Juror M.B. - R. 1081-93; Supp. V.C. 32-58; Juror C.B. - R. 1196-1200; Supp. V.C. 221-47; Juror C.C. - R. 1218-23; Supp. V.C. 329-55; Juror J.H. - R. 1282-85; Supp. V.C. 653-79; Juror M.J. - R. 1336-26; Supp. V.C. 761-87; Juror T.J. - R. 1342-52; Supp. V.C. 788-814; Juror J.K.-R. 1351-58; Supp. V.C. 815-41; Juror P.M. - R. 1473-84; Supp. V.C. 1102-28; Juror E.R. - R. 1532-38; Supp. V.C. 1291-1317; Juror J.S. - R. 1567-79; Supp. V.C. 1399-1425; Juror P.S. - R. 1602-09; Supp. V.C. 1480-1606; Juror S.W. - R. 1658-66; Supp. V.C. 1642-68.

. Phillips makes the suggestion at the conclusion of his argument that the circuit court should have granted his renewed motion for a change of venue made at the conclusion of the evidence and before closing arguments because, he intimates, one of the jurors was exposed to adverse publicity regarding the case during a recess in the trial. (Phillips’s brief, at 99-100.) There is absolutely no evidence to support this suggestion. What is clear is that the juror misunderstood the court’s inquiry regarding whether the juror had followed the court’s instructions to the jurors not to expose themselves to any media coverage regarding the case during the recess. This misunderstanding was clarified prior to proceeding with the trial. (R. 3470-74.)

.This argument was presented in Issue VII in Phillips's brief on appeal.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. When Phillips was arrested, a recently made identification card with a photograph was found that listed his name as Michael Dwayne Phillips.

. This argument was presented in Issue IV in Phillips's brief on appeal.

. This argument was presented in Issue VIII in Phillips’s brief on appeal.

. This argument was presented in Issue IX in Phillips’s brief on appeal.

. This argument was presented in Issue XI in Phillips’s brief on appeal.

. This argument was presented in Issue XII in Phillips’s brief on appeal.

. This argument was presented in Issue XIII in Phillips’s brief on appeal at pp. 141-44.

. Phillips does not contend that the charges in his particular case resulted from selective prosecution, and there is no evidence from the record that improper selective prosecution played any role in the indictment returned against Phillips. See Crawford v. State, 548 So.2d 615 (Ala.Crim.App.1989), for a discussion of selective prosecution.

. This argument was presented in Issue XIV in Phillips's brief.

. This argument was presented in Issue XV in Phillips’s brief on appeal.